# IN THE SUPREME COURT OF IOWA

No. 12–1023

Filed March 7, 2014

**IN RE THE MARRIAGE OF TRAVIS SISSON AND ALFRONIA SISSON**

Upon the Petition of
**TRAVIS SISSON,**

    Appellant,

And Concerning
**ALFRONIA SISSON,**

    Appellee.

---

On review from the Iowa Court of Appeals.

Appeal and cross-appeal from the Iowa District Court for Polk County, Glenn E. Pille, Judge.

The parties appeal from an order by the district court that modified the spousal support provisions of their decree for dissolution of marriage and denied an application to modify physical custody. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT ORDER AFFIRMED ON APPEAL AND AFFIRMED AS MODIFIED ON CROSS-APPEAL.**

Andrew B. Howie of Hudson, Mallaney, Shindler & Anderson, P.C., West Des Moines, for appellant.

Eric G. Borseth of Borseth Law Office, Altoona, for appellee.

**CADY, Chief Justice.**

In this appeal and cross-appeal from an order by the district court that modified the spousal support terms of a decree for dissolution of marriage, we primarily consider the sufficiency of a request by a former spouse, who was diagnosed with terminal cancer after the divorce, to modify the spousal support provisions of the decree to increase the amount and duration of support. On our review, we vacate the decision of the court of appeals and affirm the order of the district court as modified. We conclude a change in circumstances was established to support a modification of spousal support, and we resolve all other issues presented for review.

## I. Background Facts and Proceedings.

Travis Sisson and Alfronia Sisson dissolved their eleven-year marriage in 2008. Travis was thirty-six years old and Alfronia was forty-seven years old. They had one child, who was ten years old at the time of the divorce.

Travis was a licensed public accountant and was registered to sell securities. He owned and operated an accounting, tax, and financial services practice in West Des Moines. At the time of the divorce, his earnings were around $226,000. Alfronia had enjoyed a career in retail management, but did not work outside the home after their daughter was born. Her annual earnings when she left the workforce were around $40,000. She worked for Younkers as a manager.

A stipulated decree gave Travis and Alfronia joint legal custody and shared physical care of their daughter. The decree directed Travis to pay monthly child support to Alfronia of $1020. Travis was also obligated to pay spousal support of $1500 for eighteen months and then $500 per month for the next seventy-four months. The alimony was to terminate

along with the child support around the time their daughter completed high school.

Alfronia planned to enroll in a cosmetology school after the divorce and start a career as a cosmetologist. Travis left the marriage with a net worth of $364,000, and Alfronia had a net worth of $440,000. In short, the decree contemplated a life after divorce for Travis and Alfronia that would permit both of them to move forward as active and involved parents and give Alfronia the opportunity to begin a new career and become self-supporting.

Shortly after the divorce, Alfronia developed tremors in her hands. The most immediate outcome of this development was to alter her employment plans. Alfronia decided not to enroll in cosmetology school and, instead, returned to her employment with Younkers. However, she was hired as an assistant sales manager and was paid an hourly wage of $11.40.

The hand tremors experienced by Alfronia were only a precursor to the suffocating news that arrived in October 2009. Alfronia was diagnosed with GK Multiple Myeloma—an incurable blood cancer. Her medical doctors eventually determined she was in stage 1 of the disease. The median survival time for a person with her diagnosis is between five and seven years from the time of diagnosis. This means that fifty percent of patients will succumb to the disease in five to seven years, while fifty percent of the patients will survive beyond five to seven years. Alfronia has pursued recommended treatment to extend her life, and her physician believes Alfronia may fall within the upper half of this statistical norm, which means her life expectancy from the date of diagnosis in late 2009 would be five to seven years or more.

Despite her medical condition, Alfronia has been able to continue her employment, with some limitations. Her doctor believes Alfronia will be able to maintain relatively good health for four or five years and continue to work until the last year of her life. At that point, the disorder will not allow her to function well enough to maintain employment. However, there was no indication of the type or cost of care Alfronia will require after she is unable to work. The disorder is known to lead to kidney failure, infections, stroke, and bleeding problems, among other ailments. Alfronia will also experience fatigue.

The disease has not yet been an overriding impediment in her role as a primary caregiver, although Alfronia and Travis have had some problems and disputes as joint caretakers. While their daughter has struggled in school at times, her difficulties have more likely been related to the divorce of her parents than her mother's medical condition. Travis also remarried on January 1, 2010. This development has contributed to some of Alfronia's problems as a joint caretaker.

In April 2011, Travis initiated an action to modify the divorce decree. He sought sole physical care of their daughter and a reduction of child support. Alfronia resisted the request and responded with her own claim for modification. She asked to increase the amount and duration of alimony and to increase the amount of child support.

At the time of the modification hearing in 2012, the net worth of each party was approximately $435,000. The majority of Alfronia's assets consisted of a home and various financial accounts. Her annual income continued to be around $18,000. Her net monthly wages were $1134, and she continued to receive monthly child support of $1020 and spousal support of $500. Her monthly expenses were around $5100, which included $785 for health insurance, medicine, and medical-related

expenses. Under her health insurance plan, the maximum annual noncovered medical expenses she could be required to pay, considering deductibles and noncovered expenses under the policy, was $4475. Additionally, she incurs a $45 copay requirement for every doctor visit. Under her current treatment regimen, this requirement adds $1080 to her annual medical expenses. Alfronia must see her doctor twice each week. Some of her monthly expenses set out in her financial affidavit were for the care of their daughter and included items such as clothing, school activities, allowances, and orthodontic treatment.

The home owned by Alfronia is valued at $345,000. It is encumbered by a note and mortgage of $205,000. She has no lien on her automobile, but expects to replace the vehicle with a new car in the near future. Her other major assets are an Individual Retirement Account (IRA) valued at $150,000 and a savings account of $80,000.

Travis continues to operate his business. His wife works for him as an administrative assistant. Travis has total annual income of $246,000, and his wife earns $42,000. His net monthly income is around $13,000. Travis pays most of the extra expenses incurred by their daughter.

On March 15, 2012, the district court entered an order and judgment denying the request by Travis to modify the custody arrangement. It modified alimony by increasing the monthly amount to $2100, retroactive to May 1, 2011, which was the date Alfronia filed her application to modify. The court also extended the spousal support payments for the remainder of Alfronia's life. It further ordered Travis to pay one-half of the medical expenses incurred by Alfronia not covered by her insurance plan. The district court additionally ordered Alfronia to maintain a health insurance policy and limited the obligation of Travis to

share in her noncovered medical expenses to only those expenses incurred in the United States and related to her cancer treatment. It further directed that all payments by Travis for noncovered medical expenses be considered to be supplemental spousal support.

Both parties appealed the decision of the district court. Travis challenged the decision by the district court to deny a change in physical care. He also claimed the trial court erred in modifying spousal support. Alfronia claimed the amount of the monthly spousal support should have been increased to $3800 during the time Travis is obligated to pay child support and increased to $4800 after the child support terminates. The case was transferred to the court of appeals. The court affirmed the decision of the district court to deny the application to modify physical care. It also affirmed the retroactive increase in spousal support of $2100, as well as the order for Travis to pay one-half of the noncovered medical expenses. Finally, the court of appeals awarded Alfronia $3000 in appellate attorney fees. Travis sought, and we granted, further review.

On further review, Travis argues the modified decree is inequitable for five reasons: (1) It improperly converted an award of alimony for a finite period of time into an indefinite duration, (2) it failed to terminate the spousal support obligation in the event Alfronia would remarry, (3) it increased the amount of spousal support to a level that was inequitable, (4) it made the spousal support retroactive to the date of the modification application, and (5) it required Travis to pay one-half of the medical expenses incurred by Alfronia not covered by insurance.

## II. Scope of Review.

We review an order modifying a decree for dissolution of marriage de novo. *See In re Marriage of Feustel*, 467 N.W.2d 261, 263 (Iowa 1991); *see also* Iowa R. App. P. 6.907 ("Review in equity cases shall be

de novo."); *cf.* Iowa Code § 598.3 (2011) ("An action for dissolution of marriage shall be by equitable proceedings . . . ."). "We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). " '[W]e . . . will disturb the ruling only when there has been a failure to do equity.' " *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (quoting *In re Marriage of Romanelli*, 570 N.W.2d 761, 763 (Iowa 1997)).

### III. Modification of Spousal Support.

Provisions for the payment of support in a decree of dissolution of marriage are normally final as to the circumstances existing at the time. *Mears v. Mears*, 213 N.W.2d 511, 515 (Iowa 1973). Yet, courts are permitted to "modify child, spousal, or medical support orders when there is a substantial change in circumstances." Iowa Code § 598.21C(1). All relevant factors are considered in determining a substantial change in the circumstances, including changes in employment, income, earning capacity, health, and medical expenses of a party. *See id.* Of course, the changed circumstances must be material and substantial, essentially permanent, and not within the contemplation of the court at the time of the decree. *Mears*, 213 N.W.2d at 515.

The authority of courts to modify spousal support also includes the power to change the duration of the support from a finite period to an indefinite period. *See In re Marriage of Wessels*, 542 N.W.2d 486, 489 (Iowa 1995). However, the circumstances to support a modification of spousal support from a finite period to an indefinite period must be "extraordinary" and render the original award grossly unfair. *Id.* The unique circumstances previously found to have supported this type of

modification have included the unexpected onset of a medical condition by a party that rendered the expectation of self-support unrealistic. *See id.* at 488–89. In *In re Marriage of Marshall,* we suggested the onset of cancer was the type of circumstance that could support a modification of a finite award of spousal support. 394 N.W.2d 392, 396–97 (Iowa 1986). In *Wessels,* we found a permanent mental health condition that made future employment unlikely supported a modification of rehabilitative spousal support into permanent spousal support. 542 N.W.2d at 490.

To properly address the issues presented, we begin our analysis by considering the future contemplated by the parties at the time of their dissolution of marriage. This approach provides the needed insight into the threshold question of whether there has been a substantial change in circumstances since the dissolution of marriage to support a modification of the decree.

Based on the evidence produced at the hearing and the terms of the decree for dissolution of marriage, the parties understood that Alfronia would return to the workforce following a period of retraining and enjoy a normal work life. Likewise, the parties necessarily contemplated that the income Alfronia would receive by returning to the workforce would enable her to satisfy her financial needs, together with the other assets she received in the divorce and the spousal support paid by Travis until their daughter graduated from high school. Alfronia was unemployed during most of the marriage, and the parties relied on Travis's income for their financial support. The spousal support awarded by the district court in its decree constituted rehabilitative support. Considering Alfronia's monthly expenses at the time of the dissolution of marriage, as well as the other surrounding financial circumstances, the parties necessarily contemplated that Alfronia would eventually earn

more from her employment after the divorce than she did at the time she left the workforce after the birth of their daughter. Over time, the parties contemplated that Alfronia would not require any financial assistance from Travis to meet her financial needs.

Alfronia did return to the workforce as contemplated at the time of the divorce, but not in the manner as contemplated. Instead of entering an employment track that would give her the opportunity to meet or exceed the income level she enjoyed at the time of the marriage, Alfronia is earning less than one-half of her previous earnings. *See id.* (concluding former wife's deteriorating condition precluding her from working at anticipated levels was a substantial change in circumstances). Alfronia claims this result has been attributable to her medical condition, while Travis claims it is largely self-inflicted. Travis supports his argument with evidence that Alfronia is not working on a full-time basis, and her medical condition does not currently exclude her from full-time employment.

The preponderance of the evidence in this case reveals Alfronia's medical condition is a circumstance beyond the contemplation of the parties at the time of the dissolution of marriage, which will at some point in the future not only render her unable to work, but take her life. Travis responds that the disease has not yet progressed to the point that it has substantially changed her financial picture. He claims her request for modification is premature.

We have held that voluntary changes in employment that reduce income do not normally justify a change in circumstance to support a modification of spousal support. *See Ellis v. Ellis*, 262 N.W.2d 265, 267–68 (Iowa 1978) (holding former husband's planned voluntary retirement to move to a warmer climate was insufficient grounds for a modification

of spousal support). Yet, the evidence in this case does not support Travis's premise that Alfronia is not doing enough in her employment to assist in her own financial support or that the changes in the employment contemplated at the time of the divorce constitute a voluntary reduction of income. Alfronia's disease has not only been a factor in preventing her from pursuing a career as a cosmetologist, but it has disrupted her ability to assimilate back into her former career. She not only endures frequent and sometimes prolonged periods of medical treatment, but the presence of the disease in her life has, over all, been a general impediment in her ability to reenter and compete in the workforce. She has not voluntarily reduced her income, but has been hindered by a medical condition that has turned her world upside down.

We conclude that Alfronia has suffered a substantial reduction in her earning capacity due to her medical condition. The change is permanent and will continue to adversely impact her earning capacity as her disease progresses.

We next consider whether the consequence of Alfronia's medical condition justifies a permanent award of spousal support. Travis argues the record fails to support an award of permanent alimony because the impact of Alfronia's medical condition is too uncertain and the possibility exists that her cancer could go into remission. He claims the present circumstances are not yet extreme enough to justify permanent spousal support because Alfronia is still capable of working.

Unlike the former spouse in *Wessels*, Alfronia is currently capable of working. Yet, this factor does not mean Alfronia's particular circumstances are not extreme enough to justify permanent spousal support at this time. The circumstances to justify permanent alimony do not necessarily require unemployment, but require a change in

employment that places the former spouse in a financial position well short of the expected self-sufficiency despite good-faith efforts. *See Wessels*, 542 N.W.2d at 490 (holding former wife had shown a substantial change in circumstances in part because she was "currently not capable of holding a job," but not indicating unemployment is the *sine qua non* of modification). A preponderance of the evidence in this case supports a finding that Alfronia is doing the best that she can do under the circumstances to support herself, but has fallen far short because of unexpected circumstances beyond her control. Her claim is not premature.

Yet, the claims asserted by Alfronia cannot be resolved without further considering the totality of circumstances that impact her future financial conditions. While Alfronia has experienced significant changes in her life since the dissolution of marriage that have significantly diminished her earning capacity, Travis contends those changes still do not justify a modification in the spousal support provisions of the decree. Travis argues that Alfronia has enough savings and retirement funds to replace her diminished earnings for the remainder of her life. He also argues she may be able to obtain social security disability benefits in the future to further assist in her financial support.

The challenge in determining whether a change in the spousal support provisions of a divorce decree is warranted in this case centers primarily on Alfronia's reduced life expectancy and the existence of funds available to her that could be used to replace her diminished income. We first consider Alfronia's life expectancy.

The evidence in the case revealed that the median survival range for people with the same type of blood disorder suffered by Alfronia is between five and seven years from the time of diagnosis. Alfronia's

doctor, however, believes she may be in the fifty percentile of patients who survive beyond the median range based on her particular circumstances. Accordingly, we proceed in the analysis on that premise that Alfronia will live beyond 2016.

We next consider all of the financial resources Alfronia has available to her. *See* Iowa Code § 598.21C(1). Alfronia's reduced life expectancy brings into play those assets she has maintained to help fund her retirement years as potential assets she can begin to utilize now. Tragically, the point in time when Alfronia will leave the workplace will come much sooner than expected and the time period she will be expected to live after leaving the workplace will be much shorter than expected. Consequently, we must consider if some or all of the assets set aside for her retirement can be used now to replace some or all of the reduction in her current income. We must also consider if other cash assets can be used to help fund her current expenses.

Alfronia currently has $150,000 in her retirement account and $80,000 in a savings account. Her present monthly expenses, including the expected cost of her medical care, exceed $5000.

Alfronia earns approximately $1100 each month and receives $500 each month in spousal support. She also receives monthly child support of $1020, which is properly considered in determining spousal support in this case because Alfronia's monthly expenses included the expenses incurred in caring for their daughter. This child support will terminate in 2016, although Alfronia will likely continue to spend money on behalf of their daughter in her continuing role as a parent. Therefore, without considering the retirement and savings accounts, the stream of income currently available to Alfronia reveals she is in need of substantial financial support due to a reduction in her earning ability attributable to

her medical disorder. By the time of the modification hearing, her expenses were exceeding her income and support by more than $30,000 a year. The question of whether spousal support needs to be modified turns on the extent to which the retirement and savings accounts should be considered as a current source of financial support. If these accounts are sufficient to adequately support Alfronia, there is no justification to modify the spousal support provisions of the decree.

In light of all the circumstances, the retirement account should be considered as an asset available to Alfronia to help meet her current financial needs. Two reasons primarily support this conclusion: First, Alfronia's life expectancy has dramatically changed. This change implicates the purposes of retirement funds. These funds are set aside to provide financial support in the latter stages of life, and sadly, Alfronia is most likely now in this stage of her life. Second, the funds in the account are legally available for her use. An IRA has restrictions on the early withdrawal of funds, but Alfronia will likely have an opportunity to begin withdrawing funds from the account at this time without a penalty, and she can always withdraw funds with a penalty.[1] She has

_____

[1]Generally speaking, if a person withdraws an amount from an IRA before she reaches fifty-nine-and-a-half years, her taxes are "increased by an amount equal to 10 percent of the portion of such amount which is includible in gross income." *See* I.R.C. §§ 72(t)(1), (2)(A)(i) (2012); *see also id.* §§ 408(a) (describing an individual retirement account and its requirements), 4974(c)(4) (identifying "an individual retirement account described in section 408(a)" as a "qualified requirement plan"). Alfronia will likely not have reached fifty-nine-and-a-half years of age before needing to withdraw an amount from her IRA. However, Alfronia may be able to avoid this penalty for some of her medical expenses. *See id.* §§ 72(t)(2)(B) (providing that the ten percent penalty described in section 72(t)(1) does not apply to "[d]istributions made to the employee . . . to the extent such distributions do not exceed the amount allowable as a deduction under section 213 to the employee for amounts paid during the taxable year for medical care"), 213(a) ("There shall be allowed as a deduction the expenses paid during the taxable year, not compensated for by insurance or otherwise, for medical care of the taxpayer . . . to the extent that such expenses exceed 10 percent of adjusted gross income."). Of course, after Alfronia can no longer work, she will likely be disabled within the meaning of I.R.C. § 72(t)(2)(A)(iii). *See id.* §§ 72(m)(7) ("For purposes of this

unrestricted access to her bank account. Accordingly, the $150,000 retirement account and $80,000 savings account should be treated as assets available to Alfronia to currently assist in her financial support. Consequently, these assists should be considered as a factor in determining the overall circumstances in deciding the existence of a change in circumstances to modify spousal support.

The primary difficulty in utilizing these assets in the analysis lies in determining what portion of the funds Alfronia should be expected to start withdrawing for her support each year. This determination not only relates to her current financial needs, but also considers the length of her work life and life expectancy.

Based on the evidence presented at the modification hearing, Alfronia will more likely than not be expected to survive her disease beyond 2016. She will also be expected to work until the last year of her life and should earn approximately $20,000 annually. Her annual expenses are expected to exceed $60,000.

It is a fundamental objective that the retirement fund utilized by Alfronia to supplement her income and provide support after she will be unable to work must remain a funding source throughout her lifetime. This proposition must be met for her to satisfy her financial needs. This approach is no different for any person facing retirement and is not easy to accomplish with certainty. We do not fully consider the potential availability of future social security benefits because the record

_____

section, an individual shall be considered to be disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."), 72(t)(2)(A)(iii) (providing that "[d]istributions which are . . . attributable to the employee's being disabled within the meaning of subsection (m)(7)" are not subject to the ten percent tax penalty contained in section 72(t)(1)); *see also* 26 C.F.R. § 1.72–17A(f)(3) (2011) ("Ordinarily, a terminal illness because of disease or injury would result in disability.").

contained no evidence as to the availability or amount of such benefits. Yet, the law reveals Alfronia will likely be eligible to receive some benefits. *See* 42 U.S.C. § 423(a), (d) (2012) (providing that certain disabled persons may receive social security disability insurance benefits and defining disability for the purposes of that section).

Under all the circumstances, we conclude spousal support should be increased to $1600 per month. This determination is based on the best available understanding of the future that lies ahead for Alfronia and her foreseeable financial needs during her life expectancy, and it builds in a needed cushion to accommodate the inherent uncertainty of the length of life.

Additionally, the spousal support award must be modified to continue for the remainder of her life. The obligation to pay spousal support for life is based upon the underlying purpose of spousal support—providing support for the former spouse while they are incapable of self-support. *See In re Marriage of Olson,* 705 N.W.2d 312, 316 (Iowa 2005) ("Traditional alimony is 'payable for life or so long as a spouse is incapable of self-support'" (quoting *In re Marriage of Francis,* 442 N.W.2d 59, 64 (Iowa 1989))); *see also In re Marriage of Smith,* 573 N.W.2d 924, 926 (Iowa 1998) ("Self-sufficiency is the primary goal of rehabilitative alimony."). However, that principle normally does not apply once remarriage has occurred. *See In re Marriage of Shima,* 360 N.W.2d 827, 828 (Iowa 1985); *Myers v. Myers,* 195 N.W.2d 113, 114 (Iowa 1972). Consequently, the obligation of Travis to pay spousal support may terminate in the event Alfronia remarries. Overall, the modified spousal support award should be adequate to provide for Alfronia's financial needs for the remainder of her life, which is the objective sought to be achieved.

The spousal support awarded considers the current medical expenses incurred by Alfronia. It also considers the amount of her potential annual liability for medical expenses not covered by her insurance. Thus, we strike the provision of the modified decree by the district court that requires Travis to share in the future medical expenses incurred by Alfronia.

Travis also challenged the requirement for him to pay the modified spousal support obligation retroactive to the time Alfronia filed her claim to modify spousal support. Spousal support may be modified retroactively. *See In re Marriage of Bonnette*, 431 N.W.2d 1, 5 (Iowa Ct. App. 1988); *see also Wessels*, 542 N.W.2d at 490. In exercising our discretion to impose the award retroactively in this case, we recognize Alfronia has not experienced any decrease in her net worth since the dissolution of marriage. To some extent, this reveals Alfronia has prudently maintained her assets since the divorce despite the decrease in her income. Moreover, the modified spousal support obligation in this case is predicated on the circumstances at the time of the modification hearing, including the amount of assets held by Alfronia available for her future financial support. There was no evidence to show it would be unfair to make the award prospective from the date of the district court judgment on March 15, 2012. To the contrary, the evidence showed that modification of the spousal-support award from the entry of the modified decree would adequately provide for Alfronia's future financial needs. Consequently, the obligations under the modified decree shall be retroactive to March 15, 2012. In the event new circumstances not contemplated as of that date arise, either party may seek additional relief.

**IV. Remaining Issues.**

We affirm the decision of the district court to deny the request by Travis to modify physical care. We also affirm the decision of the district court to deny Alfronia's request for trial attorney fees. We award appellate attorney fees to Alfronia of $3000. This award is not in addition to the vacated award by the court of appeals, but replaces that award. All other provisions of modified decree by the district court are affirmed. Costs are divided equally.

**V. Conclusion.**

We vacate the decision of the court of appeals and affirm the order of the district court, as modified by this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT ORDER AFFIRMED ON APPEAL AND AFFIRMED AS MODIFIED ON CROSS-APPEAL.**