**IN THE COURT OF APPEALS OF IOWA**

No. 13-1562
Filed July 16, 2014

**IN RE THE MARRIAGE OF TRAVIS R. DUGGAN
AND DANIELLE L. DUGGAN**

**Upon the Petition of
TRAVIS R. DUGGAN,**
        Petitioner-Appellant,

**And Concerning
DANIELLE L. DUGGAN,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


        A father appeals the district court's refusal to modify the physical care

provision of the decree dissolving his marriage. **REVERSED AND REMANDED.**


        Andrew B. Howie of Hudson, Mallaney, Shindler & Anderson, P.C., West

Des Moines, for appellant.

        Stephen J. Banks of Banks Law Firm, P.C., Waukee, for appellee.


        Heard by Vogel, P.J., and Doyle and Mullins, JJ.

**VOGEL, P.J.**

Travis Duggan appeals the district court's denial of his petition to modify the physical care provisions of the decree dissolving his marriage to Danielle Duggan. He asserts because he can provide superior care, it is in the best interest of the children to be placed with him, and he has proved a substantial change in circumstances justifying the modification of the decree. On appeal, Danielle defends the district court's decision and seeks an award of appellate attorney fees. Because we find Travis has proved a substantial change in circumstances and that he can provide superior care for the children, we reverse the district court's denial of his petition to modify the physical care and remand the case to the district court to establish a visitation schedule for Danielle and to set child support.

## I. Background Facts and Proceedings.

The parties separated in 2008 and shared, on a weekly basis, the physical care of their four boys, born 1998, 2004, 2005, and 2007. In 2011, Travis moved from Ankeny to Manchester, the town where he grew up, in order to obtain a higher paying job and reduce his living expenses. In April 2011, the district court entered a decree of dissolution of marriage, incorporating the parties' stipulation, which provided the four boys would be placed in Danielle's physical care subject to Travis's visitation rights.

In September, 2011, Travis filed a contempt action against Danielle based on her failure to comply with the visitation transportation provisions of the decree. As evidence to support the contempt action, Travis submitted a recording of a voicemail message Danielle had left for him, that stated in part,

I'm not driving and putting up with those f***ing a**hole kids being dicks in the car the whole way. I'm not doing it; it's just retarded. It costs me money and time and energy. I'm not f***ing doing it. I could care less if they see you or not. To me it doesn't f***ing matter. I would prefer that they didn't.

In a text message, Danielle wrote to Travis that he could "have the boys. I can't do it all anymore. I can't afford it & I'm sick of how they act/treat me. I'll pay you no $ & see them 4 days a month. Let me know when we can get this done." The court found Danielle to be in contempt based on her failure to provide transportation for the children without good cause on at least two occasions. The court modified the decree to provide that Travis would be responsible for transportation at the beginning of visitation and Danielle would be responsible for transportation at the end.

There was also another voicemail, which occurred in September or October 2011 from Danielle to Travis and admitted by Travis at the time of the modification trial. She advised he needed to start looking for a place to take the boys because she was not "doing this anymore. I'll pay you $400 per month and you can do this bullshit. I'm done." She asked that he call her because she wanted to switch the kids at semester.

Also in the fall of 2011, Danielle allowed her then boyfriend, Charles Turner, to move into the home she was occupying with the children. Turner has an extensive criminal history involving drug-related offenses. While Danielle claims Turner only lived with them for six weeks, she did become pregnant by Turner with twins in December 2011. By January or February 2012, Danielle and Turner were no longer romantically involved.

The oldest son was suspended from school late in the 2011 fall semester for getting in a fight, and Danielle had started to arrange for counseling services for the children due to the discipline problems she was having. In January 2012, a department of human services (DHS) investigation was opened with respect to an incident between Danielle and the parties' oldest son. The son reported Danielle hit him twice during an argument causing a lump/bruise on his forehead. DHS determined the report was founded and placed Danielle on the abuse registry. While that investigation was ongoing, a second allegation was made that Danielle smacked the back of the third son's head, causing him to trip on a rug. He then struck his nose on the counter, causing swelling and bleeding. This report was also determined to be founded.

Aside from these findings, in the prior two school years leading up to the June 2013 modification trial, the two oldest boys had been tardy and absent from school a significant number of times.[1] Because of the difficult relationship Danielle was having with the oldest son, she agreed to allow Travis to have temporary physical care of him from January 2012 until the school year ended in May 2012. Travis employed a much stricter form of discipline and a much more rigid schedule, which the oldest son began to respond to after a few weeks. During the five months the oldest son stayed with Travis, his grades improved,

---

[1] The oldest son was absent three days and tardy forty-three times in the 2011-2012 school year while attending school in Des Moines. He was only present at the school until January 2012 when he went to live with Travis. In the 2010-2011 school year, this child was absent five days and tardy twenty-four times. The second oldest son was absent eight days and tardy twenty-two times in the 2010-2011 school year. He was absent four days and tardy eleven times in the 2011-2012 school year.

his attitude improved, and he attended therapy. Travis described that by the end of the 2012 school year his oldest son had changed like "night and day."

In late July 2012, twins were born to Danielle and Turner, and Turner moved back in with Danielle, the twins, and the four Duggan children. Another DHS investigation was opened in August of 2012 against Danielle as a result of a physical altercation she had with her sister, which two of the Duggan boys witnessed. The DHS investigation determined the report was founded for the denial of critical care and failure to provide proper supervision. Danielle was arrested for assault, though she was acquitted of the charge following a jury trial in February of 2013.

In September of 2012, Danielle separated from Turner again, and she had limited contact with him until March 2013. The record indicates Turner served time in jail in late 2012 on drug-related convictions. In February 2013, Danielle drafted a lengthy letter to Turner. The letter was never sent to Turner, and Danielle stated she wrote the letter as a form of therapy for her to vent her feelings as to their chaotic relationship. Danielle did not portray Turner in a positive light, stating repeatedly, in rather crude terms, he was not a good person and that her children had witnessed some of Turner's negative behavior when Danielle was not present. She stated she never should have had him in her life or around her children because he was a liar, a drunk, a hustler, a drug dealer, and a drug addict. She described how the youngest son cried himself to sleep after Turner left.

Danielle suspected Turner was not faithful to her during their relationship, possibly getting other women pregnant at the same time she was carrying the

twins. While Turner was with other women, Danielle had a physical relationship with another man named Al, and the children had been introduced to him. Danielle wrote that she would have been better off with Al. By the time of trial, Al was in a federal penitentiary. Danielle testified she could not remember Al's last name.

Professing her deep love and commitment to Turner, Danielle wrote how she regularly defended him including "beating the f*** out of my sister when she tried to come at you." Nonetheless Danielle described how Turner made her feel so bad about herself that at one point she was almost suicidal. The letter also reveals that Turner's drug use was not confined to himself, as Danielle wrote about the occasions that she and Turner "smoked numerous blunts." At trial, she backed away from that, testifying that "blunts" referred to cigars, not to marijuana.[2] Danielle wrote about talking to Turner while he was in jail and making plans for their future together as a family. However upon his release, Danielle was disappointed that Turner chose to "party" rather than being a responsible father. Danielle stated she would not have him around the children if he was selling drugs and hanging around people who would make fun of the children or treat them badly. She ended the letter proclaiming that Turner was an excellent father when he wanted to be but that he made bad decisions and surrounded himself with people who also made bad decisions.

---

[2] In the first DHS investigation report of the incident occurring in January 2012, the oldest child reported Danielle and Turner would "smoke something that does not smell like cigarettes." The child also stated he observed "a bag with a green substance in it on his mother's desk." Another child stated his mother and Turner smoke "cigars and cigarettes" in the basement. DHS requested Danielle submit to a drug screen, which came back negative for all substances.

In March 2013 Danielle started to open up communication again with Turner and allowed him back into her life for the benefit of the twins. She reported at the June 2013 trial that her recent interactions with Turner had been positive. Despite their tumultuous relationship and his criminal history, Danielle described Turner as "an excellent role model and excellent person to be around the children given the right circumstances."

In May 2013, just before the modification trial, Danielle had a third DHS investigation against her as a result of one of her twins ingesting Adderall that was prescribed for one of the older children. Danielle explained one of the older boys was hiding the Adderall in the heating register vents and the nine-month-old must have found a pill and ingested it while in the care of Danielle's parents.

In June 2013, Travis's petition to modify the physical care provisions of the dissolution decree came on for trial. Danielle was then living in Ankeny with her parents, the four boys from her marriage to Travis, and the ten-month-old twins fathered by Turner. Travis lived in Manchester with his fiancée, Tanya, and the couple's two young sons. Travis stated he was currently living in a two-bedroom home but was in the process of purchasing a larger four-bedroom home.

Travis was working the overnight shift, from 6:00 p.m. until 6:00 a.m. on a rotating two week schedule, earning approximately $45,000 per year. Travis felt his overnight schedule would give him more time with the children as he would be home in the morning to get them ready for school and home when they got home from school. He also stated he has extended weekends and days off during the week due to the rotating weekly shift. When he would be working, his

fiancée Tanya could care for the children, and she does an "excellent job" with them according to Travis.

Danielle remained unemployed at the time of trial, having last been employed in September 2012. While she was searching for a job, she testified she needed to make at least $45,000 per year to meet child care expenses and be able to support herself. She had no immediate plans to move from her parents' home. Her father receives disability due to an automobile accident during his military service, and her mother works full time at a doctor's office as an x-ray technician. Both of her parents help care for the children and provide financially for the family's needs.

In addition to the testimony of the parties and Danielle's parents, the court heard from the DHS investigators who authored the reports of the January 2012 and August 2012 incidents. The court also heard from the children's therapists.

Kerri Collins provided counseling service to the oldest child while he was in Travis's care. She had approximately six sessions with him in April and May 2012, which terminated when the child returned to Danielle's home. Collins described the child as a fairly anxious boy, and she worked with him on feeling secure in his home environment. She testified he was anxious about school, rules at home, friendships, and typical teenager issues that seemed to be paralyzing him a little bit. He expressed concern to her about his younger brothers remaining in his mother's care since he was not there to make sure they were okay. He was also anxious about returning to his mother's home, where he would be going to school the following year, and what would happen when his mother's twins were born.

Collins provided him with some relaxation and stress reduction techniques. She also taught him some communication skills especially with respect to being disciplined and how to respond when he felt something was not fair. She testified she did see improvement in him from when she started until her last session with him. He expressed to her a desire to stay at his father's house and was excited about the possibility of playing football in the fall. Collins admitted she only met with the oldest child, Travis, and Tanya, and never met the younger children or Danielle.

Jessica Pilling, from Lifeworks, also testified about the counseling she provided to the younger three boys. She began seeing the boys in February 2012, and continued seeing them until May 2013. One of boys expressed concern about possibly having to move to a different school and was also concerned with the arguments that take place between Danielle and her mother. Pilling testified it was particularly important for this child to have stability, permanency, and a feeling of safety at home. Another child was having issues with defiance and would bully his younger brother because he perceived that his mother babied the youngest son. With the youngest son, Pilling worked with getting him comfortable with the idea that he would not be the baby of the family once the twins were born. The youngest son expressed worry about his mother specifically that she was busy, should be married, and may possibly move out of state.

For all three of the boys, Pilling testified that frequent moves, changing school districts, witnessing abuse or being physically abused, and a lack of structure would all add to their level of distress. She also stated that they could

benefit from a good male role model. Pilling believed the services she provided to the boys had been productive. She stated one of the boys was bothered by the fact that Travis does not seem to take an active role in his schooling. The boys are also bothered by the fact that Travis does not call them during the week or take an interest in what goes on between his weekend visits.

The district court issued its decision in August 2013. It noted despite Travis's frequent job changes and moves in the past few years,[3] he does appear to now be stable and able to provide structure. This was seen by how well the oldest son did while in his care for a few months, though the court noted that Travis had the advantage of parenting just one of the boys, while the other three remained with Danielle.

Danielle had borne the burden of the daily needs of the boys at issue, the court found, though she had had significant assistance from her parents. The court noted the "disturbing" incidents involving the physical abuse of the children and their witnessing Danielle's physical altercation with her sister. The court was also concerned with Danielle's romantic relationships with Turner and Al who have not been stable role models for the boys. These relationships made the court "question the judgment of [Danielle] regarding proper role models for her children and the irresponsibility of engaging in a relationship with a person whom she knows very little about." The court described Danielle's life as "chaotic" though it had been stabilized mostly by the help of her parents and the love she has for her children. Her choices though, the court found, "have not been good

---

[3] We note, since the stipulated decree was entered, Travis has changed jobs twice and moved once.

in regard to relationships with other males, her behavior toward and around her children, and her own issues of irresponsibility including numerous speeding tickets and at least one conviction for a charge of theft."

With respect to the children, the court found the boys are "by and large" bonded to Danielle, though there have been some difficulties with the oldest. The court concluded that while "there is definitely much room for improvement by the part of [Danielle] in regard to her parenting abilities and in making responsible decisions about her life which affect drastically the lives of her six children," when every fact and circumstance was considered, the court was unable to find that what occurred between the original decree in April 2011 until the modification trial in June of 2013 was a "material and substantial change in circumstances that was more or less permanent." "Indeed, there have been traumas and problems which have affected the children, but the Court does not find that they are to such a degree or of such consistency that they constitute a permanent change of circumstances."

Further the court concluded that while Travis is a good parent and did well when the oldest child was placed in his care, it could not find that Travis would provide superior care to Danielle. The court found stability was particularly important to the children, and any movement of the children at this time would cause a substantial stress that would not be in their best interests. The court denied the modification petition to change the physical care arrangement but ordered Danielle to continue any and all counseling services, therapy, and/or other interventions designed to improve her ability to parent. It also ordered the

parties to meet half way between Ankeny and Manchester for visitation exchanges.

Travis appeals, asserting he should have physical care of the children.

## II. Scope and Standard of Review.

As petitions to modify a dissolution decree are heard in equity, our review is de novo. Iowa R. App. P. 6.907. "We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014).

## III. Modification of Physical Care.

The physical care provisions of a dissolution decree can be modified

only when there has been a substantial change in circumstances since the time of the decree not contemplated by the court when the decree was entered, which is more or less permanent and relates to the welfare of the child. The parent seeking to change the physical care from the primary custodial parent to the petitioning parent has a heavy burden and must show the ability to offer superior care.

*In re Marriage of Brown*, 778 N.W.2d 47, 51 (Iowa Ct. App. 2009). The parent seeking to change the physical care from the primary custodial parent has a heavy burden. *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002). This is because once custody of children has been fixed it should be disturbed only for the most cogent reasons. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

Travis asserts the district court should have placed the children in his physical care. He claims Danielle's unstable lifestyle has directly affected her ability to parent and detrimentally impacted the children. He points to the three

DHS investigations since the dissolution decree was entered in April 2011, each concluding the allegations were founded and placing her on the abuse registry— "One founded abuse report could be discounted as a fluke and not reflective of Danielle's behavior, but two founded reports based on three different incidents establish a pattern of behavior that is not conducive to good parenting." She is unemployed and has had romantic relationships with at least two men who have significant criminal histories.

Travis faults Danielle for deferring to her parents in the raising of the boys. Travis was also concerned that Danielle's father's disability affects his ability to watch the children. He claims her house lacks structure or discipline and she resorts to yelling and losing her temper when she is unable to control the boys' behavior. Travis also points out Danielle's failure to comply with the visitation transportation provisions, leading to her being found in contempt. He concludes, "Danielle's actions establish that she is a rash and selfish person who is not a good role model for the children and not fit to be a primary care parent." While conceding that stability is important for his children, Travis claims that stability does not overcome the substantial evidence of Danielle's chaotic personal, family, and professional life.

In contrast, Travis points out he "has a home of his own, a stable job, a structured routine for parenting, and a history of improving his children's behavior." He claims he will support the children's relationship with Danielle and maximize the children's opportunities to be with her. Noting his success in improving the oldest boy's grades and behavior, he thus contends he has shown

he is the superior parent justifying a modification in the physical care of the children.

Danielle defends the district court's decision. Since the DHS investigations, she claims she has learned how to better handle her feelings when parenting through the assistance of counseling, thus showing her past issues are not predictive of likely future outbursts. She claims Travis encouraged the bad behavior in the boys. She states the children are excelling in the Ankeny school district and live in a neighborhood with similarly aged children. She points out the children's counselor, Pilling, testified moving the children would add to their level of distress. With her parent's assistance, Danielle claims she has adequate housing for her children. She also points out Travis has continually moved from city to city until recently. Danielle maintains that while she will always be bonded with Turner due to the birth of the twins, she terminated their romantic relationship several months before trial. Thus, his presence in her life is not a "permanent" change in condition to justify modification.

She points out Travis also has had a founded DHS investigation against him involving a physical altercation with his now fiancée. The evidence shows Travis's and Tanya's oldest son was present when the incident occurred. Travis described that he was fighting with Tanya when she attempted to swallow pills in an apparent suicide attempt, and he choked her to prevent her from swallowing. The DHS report noted the allegation was founded for a denial of critical care and failure to provide proper supervision.

We note this incident took place in 2010, well before the parties' marriage was dissolved in April 2011. For the purposes of a modification action, we look

only to the circumstances that have occurred since the decree or prior modification was entered. *See In re Marriage of Spears*, 529 N.W.2d 299, 301 (Iowa Ct. App. 1994). However, "[i]f a parent seeks to establish a home with another adult, that adult's background and his or her relationship with the children becomes a significant factor in a custody dispute." *In re Marriage of Malloy*, 687 N.W.2d 110, 113 (Iowa Ct. App. 2004). Thus, we will consider Travis's relationship with Tanya as she will have a significant role in raising the children if physical care is modified. Travis testified the oldest son at issue was initially hesitant to trust Tanya because of the past tumultuous relationship, but after living with Travis and Tanya from January through May 2012, the oldest said he did trust her again and the relationship was good.

The founded DHS reports of abuse against Danielle are concerning. The voicemail and text messages she left for Travis in the fall of 2011 and the physical violence that occurred in her home in 2012, clearly show she was unable to properly discipline and parent the four boys for a time. Her choice of romantic partners is also concerning. She permitted men with known criminal histories to interact with and supervise the children. She has been unable to support herself through employment in the months leading up to trial, though she had given birth to twins the prior summer. While Danielle has remained unemployed, her mother provides the majority of care for the boys. If it were not for her parent's generosity, she would be unable to provide for the basic needs of her children.

Travis does not have a long history of stability in his job or his housing, though he does appear to be established now in the town in which he grew up.

While he insists his job working overnights permits him substantial time to be with his children, it is concerning he will be unavailable several evenings a week for dinner, homework, and bedtime. These parenting obligations will fall heavily on Tanya, who is also parenting the two children she has with Travis. It is clear the oldest son greatly improved during the five months he spent in Travis's care, though the district court was correct to point out that the other three boys remained in Danielle's care, permitting Travis's attention to be focused on the oldest son.

The boys clearly need stability and a positive male role model in their life. Unfortunately, for Travis to provide that positive role model, it means relocating the children out of their current school and away from their established friendships causing a certain level of distress, according to the children's therapists. However, based on our de novo review, we find Travis has established a substantial change in circumstances since the entry of the decree. *See Brown*, 778 N.W.2d at 51. Specifically, that substantial change is supported by the multiple founded DHS investigations related to Danielle's care of the children, Danielle's association with men who are not positive role models for her children, the difficulty experienced by Danielle in complying with the visitation transportation order, and the difficulty the children were having with school attendance and discipline.

In addition, we find Travis has shown he has the ability to offer superior care. *See id.* This is demonstrated most clearly by the improvement the oldest child demonstrated after the few months he lived in Travis's home. While the district court is correct that Travis was not required to parent all four of the

children at issue during this time, the care Danielle provided did not improve with the other three boys during the absence of the oldest child either. Both Danielle and Travis have two other children to parent in their home apart from the four children at issue here. The burden of parenting six children will be substantial for either party. However, based on the evidence in the record, we find Travis has demonstrated an ability to offer superior care for the children at issue.

We reverse the district court's denial of Travis's modification petition, we grant physical care of the children at issue to Travis, and we remand this case to the district court so that a visitation schedule for Danielle can be established and the appropriate child support order entered.

## IV. Appellate Attorney Fees.

Danielle seeks an award of appellate attorney fees.

> Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. Factors to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."

*In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006) (citation omitted). Based on our consideration of the factors above, we decline to award Danielle attorney fees on appeal.

Costs on appeal are assessed to Danielle.

**REVERSED AND REMANDED.**