**IN THE COURT OF APPEALS OF IOWA**

No. 17-0032
Filed January 10, 2018

**NICHOLAS R. DIETZ,**
        Petitioner-Appellee,

**vs.**

**TAMMY MCDONALD,**
        Respondent-Appellant.

_____

Appeal from the Iowa District Court for Chickasaw County, Margaret L. Lingreen, Judge.

Tammy McDonald appeals the modification of a decree of custody, visitation, and support. **AFFIRMED.**

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Heather A. Prendergast of Roberts, Stevens & Prendergast, P.L.L.C., Waterloo, for appellee.

Heard by Danilson, C.J., and Doyle and Mullins, JJ.

**DANILSON, Chief Judge.**

A mother appeals the modification of a 2012 decree concerning custody, visitation, and support. Because there has been frequent contempt litigation between the parties, continual tension between the parents, a visitation schedule that was not working as expected, and a medical diagnosis of learning disabilities since the last modification, we find there has been a substantial change of circumstances. We also conclude the father has met his burden to establish he can provide superior care by more effectively providing for the child's long-term needs. We therefore affirm the modification of physical care.

**I. Background Facts and Proceedings.**

Tammy McDonald and Nicholas (Nick) Dietz are the parents of a child, M. The parents were never married. In September 2006, shortly after the child's birth, Nick filed a petition to establish paternity, custody, and support.

*A. 2007 Decree.* On December 27, 2007, the district court entered a decree, which provides:

> [B]oth parties clearly love [M.] and are capable parents. [Nick] has made some bad judgments. . . . [Nick] also appears to be controlling in the sense that it is his belief that growing up on a farm is, without exception, the most beneficial of environments for a child. On the other hand, [Nick] appears generally more emotionally stable than [Tammy]. . . . Tammy has done a fine job raising [her older daughter] and has gone to great lengths to support the relationship between [her daughter] and her [daughter's biological] father. Also, [M.] appears to be doing very well with [Tammy] as the primary caregiver. While [Nick] has had limited contact with [M.], all of the contact that he has had with [M.] has been positive. He clearly loves [M.] and a bond now exists between them. Also, [Nick] has a great deal of family support.
> Both of the experts in this case, Dr. John Hartson and Dr. Mark Peltan, agree that shared care is in the best interests of [M.] and both feel that contact with [Nick] should be gradually increased until shared care is appropriate.

The court awarded the parties joint custody of the child. Tammy was granted physical care with increasing, graduated visitation to Nick, which was to culminate in shared physical care of the child in 2009, at which time Nick would have the child six out of every fourteen days. Nick was ordered to pay child support of $300 per month until April 1, 2009, when his support obligation would decrease to $68 per month.

**B. 2009 Modification.** In May 2009, pursuant to the parties' stipulation, the court modified the decree extending the time until June 2012 when the shared-care arrangement would occur.

The parties lived within four miles of each other in the Nashua, Iowa, area. Nick was a dairy farmer there; Tammy, a LPN and licensed massage therapist.

**C. 2012 Modification.** On February 29, 2012, Tammy filed an application to modify the decree, asserting she intended to move to Albert Lea, Minnesota, which would constitute a substantial change of circumstances. She sought physical care of M., liberal visitation for Nick, and a recalculation of child support. Nick resisted.

On June 1, 2012, Tammy moved to Albert Lea, Minnesota, to remove her daughter (now fourteen years old) from the Nashua area.[1]

A modification trial was held on June 28. On July 16, 2012, the district court entered a decree, concluding:

> In the instant case, [Tammy's] move to Albert Lea,
> Minnesota, necessitates this court to determine a primary physical
> care provider. Historically, [Tammy] has been the parent

[1] The child's counselor agreed the move could be of benefit.

addressing the bulk of [M.]'s medical and dental needs. The evidence indicates she also provides for [M.]'s social needs, such as providing him the opportunity to participate in Halloween. [Tammy] has shown a willingness to adjust her time with [M.], so as to afford [Nick] an opportunity to engage in activities, such as Cattle Congress, with [M.] This willingness to adjust time has not always been reciprocated by [Nick]. There is evidence in the record [Nick] has inappropriately discussed the move to Albert Lea with [M.] In contrast, there is no evidence in the record that [Tammy] has inappropriately discussed [Nick] with [M.]

The evidence in the record indicates [Tammy], in making the move to Albert Lea, Minnesota, has taken into consideration the benefit of the move for her daughter . . . . There is no reason to think [Tammy] does not consider [M.]'s needs in making her decisions. As previously noted, she changed her employment in 2007 to provide greater income for the family and more time with her children.

In the instant case, the court finds placement of [M.]'s primary physical care with [Tammy] is most likely to bring him to healthy physical, mental, and social maturity.

Under the 2012 modification order, the child was in Tammy's physical care Monday through Friday and attended school in Albert Lea. The child then was in Nick's physical care three of four "floating" weekends per month (to be designated by Nick the preceding month). The child was in Nick's physical care during the summers, and Tammy was allowed to designate four overnights per month.[2] Nick was ordered to provide health insurance coverage for the child and to pay $373.72 per month in child support.[3]

On November 1, 2013, the court held a hearing on competing contempt motions. The court found neither party in contempt. It did, however, enter a clarifying order:

---

[2] In a later filed order, the court noted Nick was entitled to M.'s physical care approximately forty-three percent of the year under the shared-care arrangement and approximately forty-two percent of the year under the 2012 modification.
[3] Nick's support obligation was $467.14 with a twenty percent credit for extraordinary visitation.

[Tammy] shall always be entitled to custody of [M.] for at least one weekend each month. In the event the month has only four weekends, one of which is [Nick's] holiday, [Nick] shall be entitled to choose two additional weekends. If [Tammy] has a holiday visitation, except for the 4th of July, that is deemed to include her weekend. The summer months' weekend visitations of [Tammy] are not in addition to the four overnight visitations each month during the months of June, July and August referenced in . . . the modification decree filed July 16, 2012.

Nick filed a motion to show cause in 2014. In an order dated July 10, 2015, the district court found Tammy in contempt for failing to return the child to Nick during the 2014 Christmas holiday and instead taking the child to the Virgin Islands without giving Nick prior notification. Tammy was allowed to purge the contempt by providing Nick two additional overnight visitations before a December sentencing hearing.

**D. 2016 Modification.** On June 5, 2015, Tammy filed a petition to modify, asserting "[t]here has been a substantial, material, and permanent change of circumstances since the entry of the decree affecting the best interests of the minor child," warranting the award to Tammy of sole legal authority to make the child's health care decisions and to modify the visitation schedule. In an amended answer, Nick asserted a counterclaim seeking a change of physical care on grounds Tammy "has continued to contest and deny [Nick] maximum contact with the minor child." Nick requested shared care if the parents lived in or around Nashua. In the alternative, Nick asked that physical care be placed with him, contending he offered more consistent care and a better ability to encourage the child's self-reliance.

The modification trial was conducted over several days in August and September 2016 before the same district court judge that heard the 2012

modification action and at least one of the contempt proceedings. The following findings of the district court are fully supported in the record:

[M.] commenced kindergarten in the fall of 2012. He attended school at Sibley Elementary, a public school in Albert Lea, Minnesota. The child's report card indicates he was generally proficient in kindergarten. The child was absent 7.5 days and tardy 5 days. The child had one Allison Miller for Title One. At the end of the 2012-2013 school year, [Tammy] requested Miller write a letter that [M.] should attend summer school in Albert Lea. [Tammy] did not inform Miller that the child spent most of the summer with his father in Iowa. At trial, Miller testified that, had she known the child spent summers in Iowa, it would have been up to the family to decide if they wanted the child to participate in summer school or tutoring. Miller testified that the purpose of her letter was not to require the child to participate in summer school, as Miller, herself, would have been fine with tutoring in Iowa.

[Nick], in fact, employed a tutor for the child during the summer of 2013 and has continued to employ a tutor for the child during the summer months when the child is with [Nick]. [Tammy] objected to the tutor employed by [Nick]. The evidence in the record, however, indicates the tutor is qualified.

[M.] attended school at Sibley Elementary for first grade, 2013-2014. The child's report card continues to show general proficiency in classes. However, during his first grade school year, the child was absent 20 times and tardy 48 times. In the comment section of the final report card, the child's teacher noted the child was more social than earlier in the year and the teacher saw the child interact with students at recess and times throughout the day.

[Tammy] testified at trial she observed [M.] being bullied at school. She felt the school did not appropriately address the problem. [Tammy] testified the child did not want to go to school and complained of stomachaches. The child's absences and tardies appear to have been a consequence of his unwillingness to go to school.

[Tammy] made the decision to remove the child from the public school and enroll him in a parochial school. The school, St. Theodore's Catholic School, offered smaller class sizes and Title One would again be available for the child. [Tammy] told [Nick] of her intention and sought his consent. [Nick] did not immediately agree to the change, as he wanted to give the matter thought. [Nick] ultimately spoke to staff at Sibley Elementary and contacted the parochial school regarding registration deadline. [Nick] did not agree to the change in school systems. [Nick] indicated that, in speaking to staff at Sibley Elementary, staff did not see the child

being picked on. [Nick] testified that he felt the change in school was wrong, as the child needs to learn how to cope.

[Tammy] made the change in the child's school, despite [Nick]'s objection.

[Tammy] testified she wanted to start counseling for the child and communicated that desire to [Nick] in March of 2014. [Nick] did not respond to the proposal. However, in June of 2014, [Nick] took the child to counseling at Pathways. He did this without [Tammy]'s knowledge or consent.

[M.] attended second grade (2014-2015) at St. Theodore's Catholic School in Albert Lea, Minnesota. The child's report card reflects As, Bs, and satisfactory work. The child was absent 12 days and tardy 24 days. The Court notes the change in schools did not eliminate the child's absences or tardies.

To Tammy's credit, during an eight-year well child check on March 17, 2015, she expressed concerns about the child's slow learning of new skills and reaching milestones for his age. The district court found:

As a result of this conversation, the child's medical doctor recommended the child be evaluated by a psychologist at Mayo Clinic in Austin, Minnesota. [Tammy] took the child to three appointments with Doctor Timothy Lang at the Behavioral Health Clinic in Austin, Minnesota, for evaluation. On June 2, 2015, [Tammy] met with Doctor Lang for a feedback session regarding the tests. At that time, Doctor Lang diagnosed [M.] with the following disorders: Attention deficit/hyperactivity disorder [(ADHD)], combined type; Autism spectrum disorder; Anxiety disorder, not otherwise specified.

Subsequent to the June 2, 2015, appointment, [Tammy] contacted [Nick] regarding the evaluation and results. This is the first [Nick] learned of the evaluation. Lang's recommendations made to [Tammy] included medication management, as well as educational supports. [Nick] sought further information regarding Lang's evaluation and recommendations, including the use of medication.

On November 3, 2015, [Tammy] and [Nick] met with Doctor Daniel Adu regarding medication. Medication was prescribed and started; however, it was promptly terminated due to its effect on [M.]

On January 12, 2016, . . . Julie Beckmann commenced therapy sessions with the child. Beckmann's notes, when they identify who was present, indicate both parents attended the appointments. Play therapy continued to August 10, 2016, which is the last report offered into evidence. Continued therapy

was recommended and the court has no reason to think this recommendation has not been followed. [M.]'s diagnoses on August 10, 2016, continued to include: attention deficit hyperactivity disorder; combined type; anxiety disorder, not otherwise specified with obsessive-compulsive traits. It also includes tic-like behaviors and pervasive developmental delays.

[M.] attended third grade (2015-2016) at St. Theodore's Catholic School. Again, his report card reflects As, Bs, and some Cs. He was absent nine days during the school year; however, no tardies are reported.

The district court also addressed visitation issues between the parties,

. . . Since entry of the 2012 decree, however, [Tammy] has interfered with [Nick]'s visitation schedule. The parties compete with each other for time with the child, [M.] They appear to be generally uncooperative in adjusting the visitation schedule. Although the visitation schedule established in the 2012 decree was not inconsistent with that proposed on behalf of [Tammy], [Tammy] has consistently objected to the schedule and sought changes. In a note of March 14, 2016, Julie Beckmann noted a great deal of tension between the parents. She described them as constantly arguing and bickering and disagreeing and unhappy with each other. She noted the parents found it extremely difficult to get along and they have very differing views of parenting.

Significant to the district court was the testimony of two experts:

John Hartson, a pediatric psychologist in Iowa City, Iowa, testified as to a preferred visitation schedule for a child having the diagnoses and characteristics of [M.] Doctor Hartson noted that a child with diagnosis including ADHD likes routine and predictability. The child may have difficulty making transitions. The child will have rigidity in thinking and like schedules. The child may become anxious in transitioning between parental households. Hartson testified that the best visitation schedule for children having attention deficit is fewer transitions. Hartson recommends an every-other-weekend visitation schedule during the school year and a two-week schedule during the summer. The parties propose an alternating weekly schedule during the summer months.

[Dr.] Keri Kinnaird, a psychologist, performed a custodial evaluation. Kinnaird noted the child is described as inattentive, anxious, and fairly frequently cries in the classroom. She learned that, while staying in his mother's home, the child sleeps with his mother on occasion. Kinnaird noted both parents took the child to counseling/mental health professionals without

informing the other parent. Kinnaird described the child as not an assertive child. She believes the custody litigation is harmful to the child. Kinnaird found [Nick] equipped to meet the child's needs. Kinnaird is concerned that [Tammy] is modeling a disability approach to life, rather than a coping approach. Kinnaird found [Nick] has a consistent focus on developing coping skills with the child, rather than avoidance. In contrast, Kinnaird sees [Tammy]'s approach to the child is to remove the child from the situation, so the child doesn't have to struggle. With this avoidance approach, coping skills are not developed. Kinnaird testified [Nick] is the parent whose view of the child is strength-based, rather than disability-based. Given that the child lacks confidence and coping skills, she believes his father's low-key, but matter-of-fact, expectations would be beneficial for the child.

The district court found the evidence supported Dr. Kinnaird's assessment.

At the time of the modification trial, Nick continued with his dairy farming operation. Tammy was working for Hospice of North Iowa as an independent contractor licensed massage therapist. Though living in Minnesota, Tammy's work involves traveling to various locations in Iowa. Tammy's daughter is now an adult and no longer living with Tammy and M. When living with his father, M. performs daily chores, to which he objects but after which he feels proud to have accomplished. M. is also involved in showing cattle at fairs.

The court found the child's diagnoses of ADHD and anxiety disorder constituted a material and substantial change of circumstances. The court also found that Nick had proved a superior ability to minister to the child's well-being. The court noted, "Specifically, the court recognizes [Nick] as the parent who will focus on developing coping skills for [M.] In contrast, [Tammy's] approach to remove the child from a situation, so as to avoid the situation, does a disservice in his future development and ability to meet life challenges." The court placed the child in Nick's physical care and granted Tammy alternating

weekends during the school year. During the summer, the child will alternate between the parents' homes each week.

Tammy now appeals.

**II. Scope and Standard of Review.**

Our review of an order modifying custody is de novo. *See In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014). Although we give weight to the fact-findings of the district court, particularly concerning witness credibility, we are not bound by them. *See In re Marriage of Brown*, 778 N.W.2d 47, 50 (Iowa Ct. App. 2009). "Even though we engage in a de novo review, we will not disturb the trial court's conclusions unless there has been a failure to do equity." *In re Marriage of Jacobo*, 526 N.W.2d 859, 864 (Iowa 1995). Our paramount consideration is the best interests of the child. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

**III. Discussion.**

*A. General principles.* The party seeking modification of a custody decree has the burden to demonstrate by a preponderance of the evidence that "conditions since the decree was entered have so materially and substantially changed" that it would be in the child's best interests to alter the custody arrangement. *Id.* (citation omitted). These changes "must not have been contemplated by the court when the decree was entered," "must be more or less permanent," and "must relate to the welfare of the child[]." *Id.* (citation omitted). In addition, the moving party is required to demonstrate they can more effectively minister to the child's long-term needs. *Id.*

***B. Substantial change of circumstances.*** We note Tammy complains there has not been a substantial and material change of circumstances, though she herself filed an application to modify, asserting M.'s diagnoses constituted a substantial and material change of circumstances. We acknowledge, however, a greater change of circumstances is required to warrant a change of custody than a change of visitation. *Nicolou v. Clements*, 516 N.W.2d 905, 906 (Iowa Ct. App. 1994) ("The burden upon the petitioner in a modification of visitation rights differs from the burden upon him or her in a modification of custody. The degree of change required in a modification of visitation rights is much less than the change required in a modification for custody. '[A]s to modification of visitation rights as compared to child custody changes, the general rule is that a much less extensive change of circumstances need be shown in visitation right cases.'" *Id.* (alterations in original) (citations omitted)). Because of the excessive "windshield time" for the child and the many disputes arising from visitation issues, it was clear, at a minimum, there was sufficient proof to require a change in the visitation schedule.

But beyond the visitation problems, the evidence establishes that as M. has grown older, he has displayed behaviors that raised concerns with his parents and teachers. M. has now been diagnosed with ADHD, anxiety disorder, and autism spectrum characteristics. His coping abilities are affected, which in turn affects his ability to learn and thrive.

Thus, since the last modification, there has been frequent contempt litigation between the parties, continual tension between the parents, a visitation schedule that was not working as expected, and a medical diagnosis of learning

disabilities. We also agree with the trial court's assessment that Tammy has "consistently objected to the schedule and sought changes."[4] Two experts, Dr. John Hartson and Dr. Keri Kinnaird, testified and explained the child's needs and what environment would best favor the child's best interests. Although Tammy could secure medical attention for the child's needs, she struggled to provide the environment and lifestyle that met the child's daily needs. Accordingly, we conclude there have been substantial and material changes of circumstances not contemplated by the court when the 2012 modification was entered, which are more or less permanent and relate to the welfare of the child.

*C. Superior parenting ability.* Tammy contends the trial court erred in finding Nick met his burden to prove he offers superior parenting. We observe Tammy has attended well to the basic needs for M. By virtue of her move to Albert Lea, she became the primary caregiver during the weeks. However, upon our de novo review, in light of the child's enhanced need for routine and stability, we find Nick has demonstrated he can more effectively minister to M.'s long-term needs.

At trial, Tammy asserted Nick made the child do chores all the time and that she should have physical care so the child could be "a child." She sought to

---

[4] While Tammy asserts Nick is the instigator of repeated litigation, we observe Tammy appealed from the original decree of shared care, sought to modify the decree in 2012, moved out of state days before the shared physical care plan was to take effect and before her modification petition was tried, has changed M.'s schools without Nick's consent, has taken the child out of the country without informing Nick and during Nick's parenting time, has been found in contempt of the visitation provisions, and was the parent who first filed the most recent modification action. Moreover, Tammy did not inform Nick about M.'s evaluations for ADHD until after the fact.

have M. assigned no homework. (She now argues, "Tammy's time with [the child] was work time, Nick's was fun time.")

Both parents have expressed concern for M.'s mental well-being and social development and the challenges he faces in light of his anxiety and difficulty with attention and self-confidence. The professionals who testified agree that a child with ADHD and autism spectrum characteristics benefits from a consistent, predictable routine. The custody evaluator, Dr. Kinnaird, indicated the child has a deep connection to both parents and that the best situation would be for both parents to live in and around the same community. Dr. Kinnaird testified:

> If, because of the parents' decisions, it becomes an either/or arrangement, then one thing that we know now that we didn't know years ago, before diagnosis or after diagnosis, is that right now, through therapy, [M. is] struggling to feel that he's capable. He feels incapable. He melts down to the point of tears over some typical third-grade things. So something needs to change.
> Now, I see a little boy with his father in a very brief observation and hear him talking about feeling capable and proud and good. Granted, I don't like those chores; but I like the outcome of it. I hear father talking about a little boy spontaneously on his own taking on a couple of extra duties that he wasn't even asked to do to help and feeling good about it. We need more of that for [M.] We need less of can't and we need to insulate [M.] We need less of that.

A number of witnesses testified favorably regarding Nick's consistency and predictability and that the child appears to gain self-esteem and self-reliance in his father's care. Tammy also displayed disrespect for Nick's visitation rights by regularly being late for visitation exchanges in contrast to Nick's punctual habits. We do not approve of either party's unilateral decisions that were ordered to be

made jointly, and we recognize Tammy chose that decision method more frequently than Nick. We conclude Nick has met his burden to establish he can provide superior care by more effectively providing for M.'s long-term needs.

Nick seeks an award of appellate attorney fees. "An award of appellate attorney fees is within the discretion of the appellate court." *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). We are to consider "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* (citation omitted). Tammy shall pay $2000 toward Nick's appellate attorney fees.

## IV. Conclusion.

Because there has been frequent contempt litigation between the parties, continual tension between the parents, a visitation schedule that was not working as expected, and a medical diagnosis of learning disabilities since the last modification, we find there has been a substantial change of circumstances. We also conclude the father has met his burden to establish he can provide superior care by more effectively providing for the child's long-term needs. We therefore affirm the modification of physical care.

**AFFIRMED.**