**IN THE COURT OF APPEALS OF IOWA**

No. 15-0798
Filed December 23, 2015

**IN RE THE MARRIAGE OF JEFFREY CHARLES REDMAN
AND JANET LEE REDMAN**

**Upon the Petition of
JEFFREY CHARLES REDMAN,**
        Petitioner-Appellant,

**And Concerning
JANET LEE REDMAN,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Scott County, Mark R. Lawson,

Judge.


        A father appeals the district court ruling denying his request to modify the

provision of the parties' dissolution decree granting the mother physical care of

the parties' children.  **AFFIRMED.**


        Dennis D. Jasper, Bettendorf, for appellant.

        Maria K. Pauly of Maria K. Pauly Law Firm, P.C., Davenport, for appellee.


        Heard by Vogel, P.J., and Vaitheswaran and Bower, JJ.

**BOWER, Judge**

Jeffrey Redman appeals the district court's ruling declining his request to modify the provision of the parties' dissolution decree granting Janet Redman physical care of the parties' children. Janet requests an award of appellate attorney fees. We affirm.

## I.        Background Facts and Proceedings

Jeff and Janet are the parents of two children, J.R., born in 2003, and K.R., born in 2007.[1] K.R., the biological daughter of Jeff's sister, Margaret Searle, was born drug-affected with cocaine in her system. Shortly after her birth, K.R. was placed in foster care with Jeff and Janet, who subsequently adopted her. J.R. has a learning disability and an individual education plan (IEP) at school. With extra school involvement, both children are performing adequately academically, but K.R. struggles with behavioral issues.

During the proceedings to terminate Margaret and the father's parental rights, the termination court found Margaret had a history of substance abuse and mental problems. The court also stated K.R., as a toddler, had "suffered trauma" resulting in the Iowa Department of Human Services (DHS) reporting "founded sexual abuse to the child by a perpetrator unknown." The court terminated Margaret (and the father's) parental rights, stating as one reason the fact Margaret was living with her father and K.R.'s grandfather, Dr. Arthur Searle, and placement "in this home would be inappropriate because of [Art's] presence there." During Jeff and Janet's marriage, Art was not active in the children's

---

[1] Both parties have one older child from prior relationships. Jeff has visitation with his son, age thirteen, on alternate weekends. Janet's adult daughter lives in Boston.

lives. After hearing additional evidence in the modification proceedings, the modification court concluded: "Suffice it to say, the court believes the record amply demonstrates that any reasonable parent would be concerned enough with Dr. Searle's conduct not to allow him to be alone with children."[2] Upon our de novo review of the record, we agree with the modification court.

**A. Dissolution.** Jeff initiated dissolution proceedings. In December 2012, Jeff took J.R. to a child and adolescent clinical nurse specialist for counseling. Janet brought K.R. to the same counselor in August 2013. Thereafter, the children have attended weekly sessions, including sessions with Jeff and Janet.

The parties' stipulated decree of dissolution was accepted by the court and filed on November 22, 2013. The court granted joint legal custody to the parties with physical care to Janet and liberal visitation to Jeff. The court also continued the temporary protective order prohibiting Jeff from contacting Janet. Nevertheless, the parties communicated by text. Jeff has worked full time for Alcoa for over three years. The dissolution court ordered Jeff to pay $590 per month in child support to Janet.

Shortly after the dissolution, the parties agreed to modify Jeff's visitation schedule to accommodate his work schedule at Alcoa—four twelve-hour shifts on one week followed by three twelve-hour shifts the following week—generally,

---

[2] The modification court explained it was not providing more detail because Janet had used prior judicial proceedings to report Dr. Searle to the Iowa medical board. The court also stated "Dr. Searle underwent extensive evaluation, and that no professional discipline was imposed. The court also notes [he] has never faced criminal charges." Like the modification court, we also decline to detail specific testimony.

6:00 p.m. to 6:00 a.m. After the de facto modification, the children's visitation schedule varied week to week but resulted, overall, in a two-week visitation rotation. Generally, due to his work hours, Jeff declined to exercise his Wednesday evening visitation.

The month after the dissolution, December 2013, Art's holding company purchased a three-bedroom house where Jeff is currently living. Jeff's new home is located near the house Art previously had purchased for Margaret. Also in December, Jeff unilaterally decided to introduce K.R. to Margaret, telling K.R. that Margaret was her aunt. Contacts between K.R. and Margaret ensued. Jeff told Janet, who was unhappy with Jeff's unilateral decision, Margaret had really changed. K.R. shortly thereafter found out that Margaret was her biological mother. After J.R. complained to his mother that Margaret and Art were favoring K.R., Janet floated the idea to Jeff of K.R. and J.R. having separate visitation times so each child received attention, but the proposal was not enacted.

In February 2014, Janet texted Jeff, stating she did not want Margaret picking up her kids. Jeff replied: "If Margaret comes with me, then she comes with me." Later, Jeff allowed Margaret to drive the children back to Janet's home without him. In early March 2014, Art took K.R. and her brothers, ages eleven and thirteen, to a folk dance in Iowa City, even though a reasonable parent would not have allowed unsupervised visitation with Art. Jeff believed nothing inappropriate could happen because the boys joined the excursion. A reasonable parent would not believe teenage boys could provide supervision.

Our de novo review of the record shows support for the district court's findings:

In the spring of 2014, Jeff and Janet discussed a voluntary modification of the decree. They discussed a transfer of physical care of K.R. to Jeff—together with the adoption subsidy they receive for [her]—in return for Jeff's payment of J.R.'s child support in advance (approximately $50,0000). The parties also discussed establishing a bank account for medical expenses. Jeff was to maintain health insurance for both children. Although [at trial] Janet denies discussing this arrangement, the court finds her testimony is not credible . . . .[3]

**B. Modification.** Jeff responded to Janet's offer by suggesting he pay $25,000 as a fair amount for one child's child support, and then suggesting he pay $35,000. Negotiations broke down, and at the end of May 2014, Jeff filed a petition to modify physical care, seeking physical care of both children. Janet answered and counterclaimed, seeking to change Jeff's visitation schedule. After Jeff's filing, Janet demonstrated immaturity and an inability to put the interests of the children first by insisting the parties return to the visitation provisions in the decree and abandon their de facto visitation arrangement. After a hearing on Jeff's motion for visitation, the court's August 2014 ruling found the "de facto visitation schedule" the parties had been using and "that is conducive to the work schedules of the parties and allows for the children to maximize the amount of time they spend with a parent" should remain in place.

Also in August 2014, Jeff pulled the children into adult issues. Jeff told the children he was planning a trip with them to the Wisconsin Dells and it was

---

[3] During a subsequent DHS investigation of Jeff spanking K.R. with a wooden "back scratcher," Janet told the investigator that she had stressed to Jeff that a split of physical care for the children would only be considered if Art and Margaret were not in the picture or around the kids, based on the past harm and risk of harm.

Janet's fault they could not go on the trip.[4] When the children's counselor confronted Jeff about how he handled the situation, Jeff demonstrated immaturity and an inability to put the interests of the children first by defending his actions and insisting the children had a right and a need to know.

In September 2014, Jeff spanked K.R., who discussed the paddling with her counselor, a mandatory reporter to DHS. The DHS investigator consulted with K.R.'s doctor, who stated "there are components of emotional trauma occurring." In mid-October of 2014, the DHS confirmed both physical injury (Jeff spanking K.R. with a wooden "back scratcher") and denial of critical care—failure to provide proper supervision (Jeff allowing K.R. to have multiple interactions with Margaret and Art without adult supervision).[5] Jeff asked DHS to reopen the physical-injury investigation, and it did. Two days later, the children's counselor told DHS that Jeff "is asking questions of [K.R.] in a manner which is leading and negative. There is some question as to the potential emotional damage this could cause."

In November 2014, DHS issued an addendum changing its physical-care finding to "not confirmed." The change was based on the additional investigation

---

[4] In the summer of 2014, the door to the basement in Jeff's home was damaged and had a big hole, but the children did not know how that occurred. Jeff stated he was not angry but rather was practicing boxing when he created the hole.

[5] When the DHS investigator told Jeff about the findings, she also asked if he had reviewed the written materials she had given him on "protecting children from sexual abuse. Jeff advised he has those papers posted on his refrigerator [as] a reminder to him." Jeff stated neither child had the ability to read the papers. The DHS investigator then "advised Jeff the papers were meant for him, as an adult, and are not intended for the children to see. He was encouraged to remove them. Jeff said we would have to agree to disagree."

showing K.R. had fallen out of a tree on the same day Jeff spanked her.[6] The addendum did not change the confirmed finding as to Jeff inappropriately allowing K.R. to have unsupervised interactions with Margaret and Art. Although confirmed, the report was not placed on the registry due to the situation appearing to be "minor, isolated, and unlikely to reoccur."

In March 2015, a two-day modification hearing commenced. Janet had recently obtained a part-time job at a nearby mechanic's shop and adjusts her schedule to meet the children's schedule. She was also working towards reactivating her training as a pharmacy tech. Several days after the hearing, the court entered a ruling declining to modify physical care, declining to modify Jeff's visitation, and declining to extend the protective order. Our de novo review of the record supports the modification court's findings:

> The court gives the children's stated preferences no weight due to their ages and lack of maturity. In addition, there is substantial evidence the children have been coached by Jeff. Specifically, [the children's counselor] testified that many of their responses appear to be rehearsed. The court finds the children have been influenced to a degree to render their opinions unreliable.

The court imputed income to Janet, set child support for Jeff, and modified this support in a post-trial order recognizing Jeff's extraordinary visitation. Jeff now appeals.

---

[6] The DHS addendum stated, while Jeff may have caused K.R.'s physical injury, "there is not a preponderance of the evidence at this time to state that is how the markings were incurred."

**II.     Standard of Review**

We review modification proceedings de novo. *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014). We examine the entire record and decide anew the legal and factual issues properly presented. *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). We "recognize that the district court was able to listen to and observe the parties and witnesses." *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). Consequently, we give weight to the district court's findings of fact, especially when considering the credibility of witnesses, but we are not bound by them. *In re Marriage of Brown*, 778 N.W.2d 47, 50 (Iowa Ct. App. 2009).

**III.    Discussion**

Jeff argues the district court should have modified the decree to award him physical care of the children.

Physical care is the right and responsibility to maintain a home for the children and provide for the routine care of the children. *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007) (recognizing the district court's opportunity to observe the witnesses). Here, Jeff "is seeking the most significant modification," a "modification that would remove the parties' children from [Janet's] physical care and place them in his physical care." *See In re Marriage of Thielges*, 623 N.W.2d 232, 236 (Iowa Ct. App. 2000). To succeed in this "significant modification," Jeff has a heavy burden. *See In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). Jeff "must establish by a preponderance of the evidence that conditions since the decree was entered

have so materially and substantially changed that the children's best interests make it expedient" to modify custody. *See Thielges*, at 236. Additionally, Jeff "must also prove [he] has the ability to minister more effectively to the well-being of the parties' children." *Id.* at 237. The best interests of the children are the controlling considerations. *Id.* at 235.

The burden upon Jeff is heavy "because children deserve the security of knowing where they will grow up, and we recognize the trauma and uncertainty these proceedings cause all children." *See In re Marriage of Rosenfeld*, 524 N.W.2d 212, 213–14 (Iowa Ct. App. 1994). Consequently, once physical care has been fixed, it "should be disturbed only for the most cogent reasons." *Id.* at 214. We will not disturb the modification court's ruling unless "there has been a failure to do equity." *Sisson*, 843 N.W.2d at 870.

Our reading of the record shows that since entry of the dissolution decree, the parties have struggled to put their children's best interests ahead of their own discontent with and animosities toward each other.[7] It is clear that up to this point, despite the fact both Janet and Jeff love their children, they have deliberately and intentionally put their own agendas ahead of the children's best interests. It is also exceedingly clear the children's emotional health is being affected by their parent's immature and unnecessary behavior towards each other. We urge both parents to act with more maturity, to discontinue efforts to

---

[7] As an example, Janet called the police to the school, claiming Jeff had violated the no-contact order. But by prior arrangement with the school, Jeff and not Janet had planned to be there for a discussion. Similarly, Jeff spoke negatively about Janet to the parties' previous foster child, claiming Janet had spanked K.R. in an attempt to get Jeff in trouble with the DHS—even though Jeff had already admitted to DHS that he spanked K.R. with a wooden "back scratcher."

alienate the children from the other parent under the untenable claim of the children's "right to know," and to act on their love for the children by putting the children's interests first.

We turn to the issue before us, which is not an original custody determination. In support of his modification claim, Jeff alleges a myriad of bad behavior by Janet and contends the district court should have considered the *cumulative effect* of the evidence showing: (1) Janet has not been attentive to school and homework issues; (2) Janet does not properly feed the children; (3) Janet does not meet the children's needs as to dental work and medications; (4) Janet allowed K.R. to come into possession of a page from a pornographic magazine at her house; (5) Janet is financially irresponsible by not working more hours; and (6) Janet sought a voluntary modification that split the physical care of the children in return for Jeff's prepayment of child support. Jeff claims the cumulative effect of these factors establishes a substantial change in circumstances warranting modification.

Upon our review of the record, we, like the district court, are not persuaded the evidence shows Janet does not properly feed the children. The children's long-term counselor testified she has no concerns in this regard and had discussed with J.R. "wants" (food not currently in the home) versus "needs" (eating the food in the home). Further, the record shows J.R. has been gaining weight. Our review also shows any dental issues were due to the parent's communication difficulties. Janet, not Jeff, sets up and takes the children to all their medical appointments, and Janet, for the most part, has made sure J.R.'s

ADHD medication is administered. Finally, Janet's decision to work part-time so that she is always home when the children are home does not demonstrate financial irresponsibility in the circumstances of this case.

Thus, after concluding Jeff has failed to prove factors two, three, and five, we turn to the cumulative effect of factors one, four, and six. The record shows Janet was not as attentive as she should have been to the children's school and homework issues in the fall of 2013 and spring of 2014. But, the record also shows Janet has since increased her participation, making any effect diminished by Janet's recognition and correction of this factor. As to factor four, the district court concluded: "[T]he incident is troubling—especially in light of K.R.'s history of sexual abuse—[but] the court is convinced it was an isolated incident." As to factor six, the record shows Jeff was upset by the amount Janet requested in prepaid child support and as a result made two different counteroffers during the negotiations. The district court had the benefit of observing the parties and their demeanor during the modification hearing, which causes us to defer to the district court's impressions and evaluation of the parties. *See In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996). Accordingly, this "isolated incident," even when combined with Janet's previously ineffectual but improved interaction with the school and with Janet's efforts to negotiate a voluntary change in custody, is not sufficient to meet the substantial-and-material-change standard, given both Jeff's "heavy burden" and the deference we accord the district court.

Even if there had been a substantial change in circumstances, on our de novo review we also agree with the district court's finding that modifying physical

care would not be in the children's best interests. The record shows that Jeff is so heavily invested in making Janet look bad that he cannot see how his well-documented behavior negatively impacts the children. Thus, we agree with the court's conclusion Jeff failed "to demonstrate that he has the ability to minister more effectively to the needs of the children." At most, the record shows Jeff and Janet are both fallible human beings who love their children. *See Rosenfeld*, 524 N.W.2d at 213 ("If both parents are found to be equally competent to minister to the children, custody should not be changed."). Jeff emphasizes Janet's proposal the parties split the care of the children while minimizing his unilateral actions interweaving Margaret in and out of K.R.'s life. We are also concerned whether Jeff fully appreciates the potential danger to his children from *any* unsupervised contact with Art, who recently increased his financial support of Jeff. On balance, the split-custody discussion, which occurred after Jeff unilaterally initiated contact between K.R. and Margaret and after Jeff rebuffed Janet's concerns thereafter about making Margaret a part of K.R.'s life, does not overcome the myriad of concerns we have with Jeff's parenting behavior and overall behavior (succinctly set forth by the district court). No purpose would be served by restating the court's analysis here, as we agree with its discussion of the parties' strengths and weaknesses. *See id.* (stating physical care "once fixed should be disturbed only for the most cogent reasons"); *see also In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (stating a district court "is greatly helped in making a wise decision about the parties by listening to them and watching them in person").

We recognize the district court has "reasonable discretion" in resolving modification-of-physical-care issues and its "discretion will not be disturbed on appeal unless there is a failure to do equity." *In re Marriage of McKenzie*, 709 N.W.2d 528, 531 (Iowa 2006). Under the circumstances of this case, we cannot conclude the district court failed to do equity.

**IV.    Appellate Attorney Fees**

Janet requests an award of appellate attorney fees. "An award of appellate attorney fees is not a matter of right but rests within our discretion." *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997). In addressing Janet's request we consider her needs in making it, the ability of Jeff to pay, and whether Janet was obligated to defend the district court's decision on appeal. *See id.* Janet has prevailed under our review. Given the circumstances of the parties, we find equity requires Jeff to contribute toward Janet's appellate attorney fees. We order Jeff to pay $1500 of Janet's appellate attorney fees.

The costs of this appeal are taxed to Jeff.

**AFFIRMED.**