# IN THE COURT OF APPEALS OF IOWA

No. 15-2228
Filed November 9, 2016

IN RE THE MARRIAGE OF JEREMIAH SCOTT
AND ANNA TURNER-SCOTT

Upon the Petition of
JEREMIAH SCOTT,
        Petitioner-Appellant,

And Concerning
ANNA TURNER-SCOTT,
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Scott County, Nancy S. Tabor,

Judge.


        Jeremiah Scott appeals the district court's grant of Anna Turner-Scott's

application for modification of the physical-care provisions of the decree

dissolving their marriage.  **AFFIRMED.**


        Michael J. McCarthy of McCarthy, Lammers & Hines, L.L.P., Davenport,

for appellant.

        Maria K. Pauly of Maria K. Pauly Law Office, P.C., Davenport, for

appellee.


        Considered by Potterfield, P.J., and Mullins and McDonald, JJ.  Tabor, J.,

takes no part.

**MULLINS, Judge.**

Jeremiah Scott appeals the district court's grant of Anna Turner-Scott's application for modification of the physical-care provisions of the decree dissolving their marriage. Jeremiah concedes his relocation to Hawaii constitutes a substantial change in circumstances but contends Anna failed to prove the move detrimentally affected the children's best interests and failed to establish she possessed a superior ability to parent the children. Both parties request appellate attorney fees. Upon our de novo review, we affirm.

## I. Background Facts and Proceedings

Anna and Jeremiah first met in Hawaii after beginning a relationship on the internet. They were married in 2006 and divorced in 2013. They have two minor children: W.S., born in 2007, and R.S., born in 2009. At all times during the marriage, the parties resided in Iowa, although both parties acknowledged they had often discussed a move to Hawaii.

At the time of the dissolution, Jeremiah was employed full time earning a gross annual salary of approximately $50,000. He had also purchased a condo in the Quad Cities area. Anna planned to join the National Guard and faced the possibility of deployment after completing training.[1] She had temporarily moved in with her parents and later moved with her oldest son[2] to the home of her boyfriend in Eldridge. For all these reasons, the parties stipulated to joint legal custody of their two children and agreed Jeremiah would have physical care of

---

[1] Neither party presented any evidence at the modification trial regarding whether Anna was ever deployed or whether she was still employed by the military and still faced the possibility of deployment.

[2] At the time of the modification trial, Anna's oldest son was a senior in high school.

the children and Anna would enjoy extraordinary visitation.[3]  The decree awarded Anna overnight visitation every other weekend and twice during the week, alternating overnight visitation on spring break, one-half of the winter school break each year, and three one-week periods of uninterrupted overnight visitation during the summer.  The court reserved the issue of child support.[4]

In January 2015, Anna was hired as a long-term substitute teacher.  She had a regular schedule and often picked the children up from school and spent time with them before Jeremiah got off work around 6 p.m., when he would come pick the children up from Anna.  The parties communicated frequently about the children without issue.  Jeremiah strongly encouraged the children's relationships with Anna's family and brought the children to their maternal grandparents' home for weekly dinners, holidays, and random drop-ins.[5]

The record shows Jeremiah first brought up the idea of his move to Hawaii with the children to Anna in January 2015 and asked for her input.  She objected. In May, Anna filed an application to modify physical care of the children.  In July, Jeremiah formally advised Anna and her family of his intention to move with the children.  In August 2015, Jeremiah moved with the children to Hilo, Hawaii.[6]

---

[3] "Extraordinary visitation" is defined as visitation that "exceeds 127 days per year." Iowa Ct. R. 9.9.

[4] At some point, Anna lost her job and stopped paying her half of the daycare expenses. In November 2014, Jeremiah was experiencing difficulty in paying his expenses and applied for child support.  In March 2015, the court entered an order requiring Anna to pay child support to Jeremiah.  Anna remained current on her child-support obligation since entry of the order.

[5] Anna testified Jeremiah spent so much time with the children at her parents' home that she felt uncomfortable and had to ask him to spend less time there after the divorce.

[6] Anna had filed an application to enjoin Jeremiah from moving with the children but later withdrew her application prior to his move.

Jeremiah grew up in Hawaii and graduated from high school there. His father and step-mother own two adjacent homes on a several-acre property in a rural farm setting. Jeremiah's parents offered their second home to him rent-free to help ease his financial burdens.[7] At the time of the move, Jeremiah did not have a job lined up in Hawaii; however, within a few weeks Jeremiah's transfer from his employer in Iowa went through, and he was rehired full time at the same salary level. Additionally, Jeremiah no longer had daycare expenses for the children because he enrolled them in a low-cost, after-school program,[8] and his step-mother was otherwise able to care for the children while he was working.

At the time of the modification trial, Anna was employed full time as a special education teacher and was finishing her master's degree in special education. Due to the time zone difference between Iowa and Hawaii, the only scheduled time for telephone contact between Anna and the children occurred when the children were on their way to school and Anna was at work. Neither party scheduled any other time for phone contact or video calling. Anna testified she spoke with the children almost on a daily basis but there were times when the children did not answer or call her back. She further testified she believed Jeremiah encouraged the children to call her on weekends but, because he

---

[7] Jeremiah attempted to sell his condo prior to the move; however, the pending sale fell through. At the time of the modification trial, the condo was still listed for sale.

[8] There was much discussion in the record about the cost of the after-school program to Jeremiah. When Jeremiah first moved to Hawaii, he was unemployed. When he enrolled the children in the after-school program, he reported his unemployment and received after-school care for the children in the program at no cost. At the modification trial, Jeremiah testified the after-school program knew he had been hired and was working but stated they did not request new salary information and he did not voluntarily update the information for a rate recalculation. Jeremiah further testified he believed his rate would be eighty dollars per month, per child based upon his new salary, and he anticipated paying the full rate the following year when the program requested salary information to determine his new rate.

worked, he could not ensure the children called her when they were in their paternal grandparents' care. There were no scheduled times for the children to call their maternal grandparents or their maternal great-grandmother.

Both parties acknowledged they had previously discussed moving to Hawaii during the marriage, however, Anna never agreed to the move. It was undisputed at the modification trial that Jeremiah had assured Anna at the time of the dissolution that he would never move the children to Hawaii if he had physical care, and Anna testified she agreed to the physical-care arrangement based in part on his assurances.

Anna admitted Jeremiah was a good father, she had no concerns regarding his parenting, and he supported her relationship with the children and encouraged phone contact between them. However, Anna claimed Jeremiah failed to provide her with any educational or medical information regarding the children unless she specifically requested it.[9] Anna also claimed Jeremiah denied her visitation after the move by failing to return the children to Iowa for Anna to exercise her Labor Day visitation with the children and failed to return the children for the parties' settlement conference.[10] Anna further testified she obtained a court order requiring Jeremiah to return the children for winter break because she assumed he would not after he failed to respond to her inquiries.

---

[9] Anna testified Jeremiah provided her with the name of the children's school and their address in Hawaii. She claimed she had to seek out all other information regarding the children's education, either by performing searches online or through initiating contact with the children's school. Jeremiah admitted that, although he had selected a new healthcare clinic for the children and had the children's records transferred from Iowa, he did not provide Anna the name of the children's doctor or dentist in Hawaii because the children had not had any health concerns since moving to Hawaii.
[10] Jeremiah also did not return for the settlement conference, he participated by phone instead.

On rebuttal, Anna presented evidence the school in Hawaii operated on an alternate schedule that allowed for longer breaks throughout the school year but a shorter summer break.

The record shows both parties were active in the children's education and activities in Iowa. The children's first-quarter report cards showed the children were struggling in their new school; however, both parties testified that although the children struggled when they first moved to Hawaii, they were young, resilient, and had adjusted well by the time of the December trial. Jeremiah testified the children were improving in school, although he had not yet received the children's second-quarter report cards.[11] The record shows prior to the move, W.S. required an Individualized Education Program (IEP), but following an evaluation in Hawaii, W.S.'s school determined an IEP was no longer required.[12] Jeremiah testified he did not believe he had an obligation to keep Anna informed about the children's education or school activities because Anna was in direct communication with the school and had not asked him for updates. Anna testified she had attempted to communicate with the school with little success and had not received any documentation or progress updates regarding the children. Neither party presented any evidence Jeremiah refused to provide

---

[11] Jeremiah testified he based his assessment of the children's progress on his contact with the school and the children's teachers, including the teachers' daily progress notes in their take-home planners. Jeremiah also testified R.S. had recently been selected as student of the month and W.S. was happier since being integrated into the regular classroom.

[12] Anna testified the school invited her to telephonically participate in the IEP meeting for W.S., but she was unable to due to the time difference and her work schedule. Anna disagreed with the school's determinations and testified she continued to have concerns regarding his education and believed he should still have an IEP in place. Jeremiah testified W.S. was happy to be involved in regular classes with his classmates.

Anna with information or blocked Anna from receiving information from the school.

Following trial, the district court modified the decree to award Anna physical care of the children and visitation to Jeremiah. The court's order provided Jeremiah would exercise visitation every summer from the week after the children finish the school year until one week prior to the start of school, every other spring break, one-half of the winter holiday, and whenever Jeremiah was within 150 miles of the children. The court ordered the costs of transportation for the summer visitation to be split between the parties and the costs of all other transportation to be paid for by Jeremiah. The court also ordered Jeremiah to pay $957 per month in child support to Anna.

Jeremiah filed an application to stay the court's ruling modifying physical care, which our supreme court denied. Jeremiah appeals.

## II.     Scope and Standard of Review

Because an action to modify a dissolution decree is heard in equity, our review is de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014). We give weight to the factual findings of the district court, especially with regard to witness credibility, but we are not bound by them. *See* Iowa R. App. P. 6.904(3)(g); *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Case precedent has little value, and we must base our decision on the particular circumstances of the case before us. *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002).

### III. Analysis

#### A. Physical Care

Courts may modify the custody or care provisions of a decree only when the record reveals "a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of the child[ren]." *Id.* The burden is on the party seeking modification to show a substantial change by a preponderance of the evidence. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). In addition, the party seeking modification must also demonstrate "a superior ability to minister to the needs of the children." *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). This heavy burden results from the principle that once a custodial arrangement is established, "it should be disturbed only for the most cogent reasons." *Frederici*, 338 N.W.2d at 158. As in any custody or care determination, our paramount concern is the best interests of the children. *See* Iowa R. App. P. 6.904(3)(o); *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

Jeremiah concedes his move to Hawaii constitutes a permanent, substantial change in circumstances relating to the welfare of the children that was not contemplated at the time of the decree. We agree. *See* Iowa Code § 598.21D (2015) (permitting courts to consider the relocation of a custodial parent of 150 miles or greater a substantial change in circumstances in modification proceedings).

Having found a substantial change in circumstances, we must next determine whether Anna has met her burden to show she can offer superior

care. *Frederici*, 338 N.W.2d at 158. When the custodial parent plans to relocate, the burden is on the noncustodial parent "to demonstrate the move will detrimentally affect the child[ren]'s best interests." *In re Marriage of Montgomery*, 521 N.W.2d 471, 474 (Iowa Ct. App. 1994). In determining whether to disallow removal of the children from their present home, the court must consider all of the surrounding circumstances—including the reasons for the removal, the new location, the distance to the new location, the relative advantages and disadvantages of the new location, the impact on the children, and the impact on the joint custodial and access rights of the other parent. *Frederici*, 338 N.W.2d at 160. Additionally, a court must consider "all the other relevant conditions affecting physical care." *In re Marriage of Thielges*, 623 N.W.2d 232, 238 (Iowa Ct. App. 2000).

"Iowa courts have historically not changed custody on the basis of a parent's move from the area where both parties reside absent other circumstances." *In re Marriage of Mayfield*, 577 N.W.2d 872, 873 (Iowa Ct. App. 1998); *see also In re Marriage of Jerome*, 378 N.W.2d 302, 305 (Iowa Ct. App. 1985) ("The Iowa courts in recent years have recognized how mobile our society is and have been reluctant to limit a custodial parent to a geographic area where there is evidence that the custodial parent has valid economic reasons for moving and the move is not predicated on an attempt to limit visitation of the noncustodial parent."). "If both parents are found to be equally competent to minister to the children, custody should not be changed." *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 213 (Iowa Ct. App. 1994). Nevertheless, "we give considerable deference to the district court's credibility determinations because

the court has a firsthand opportunity to hear the evidence and view the witnesses." *In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007); *see also In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("A trial court deciding dissolution cases 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.' In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented." (citation omitted)); *In re Marriage of Rademacher*, No. 11-0798, 2011 WL 5868041, at *3 (Iowa Ct. App. Nov. 23, 2011) ("A witness's facial expressions, vocal intonation, eye movement, gestures, posture, body language, and courtroom conduct, both on and off the stand, are not reflected in the transcript. Hidden attitudes, feelings, and opinions may be detected from this 'nonverbal leakage.' Thus, the trial judge is in the best position to assess witnesses' interest in the trial, their motive, candor, bias and prejudice." (citation omitted)).

The record shows both Anna and Jeremiah are capable of providing a high level of care for their children. But the district court found Jeremiah had not put the children's best interests first when he decided to move to Hawaii and was instead "clearly acting in his own interest at that time."[13] The court also found Jeremiah had displayed "a pattern of . . . attempts to frustrate continuing and meaningful contact between the children and their mother." The court discussed Jeremiah's reaction to his daughter crying following a phone call with her mother

---

[13] On our de novo review of the record, we do not find support for some of the district court's factual findings; but we conclude those differences do not impact our ultimate conclusion.

by immediately texting Anna while driving to berate her for making the child cry and Jeremiah's failure to allow Anna the opportunity to privately say goodbye to the children before they moved, and determined Jeremiah "lack[ed] [the] ability to consider the children's emotional needs" or "tak[e] into account . . . the grieving process that they are going through from being moved away from their mother and their extended family and friends." *See In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998) ("[T]hat which is least disruptive emotionally to the child should be given greatest consideration in achieving the ultimate goal of the child's long-term best interests.").

Furthermore, the court found "Jeremiah has not changed his attitude and is not following the decree provisions to communicate with Anna the information about the children" regarding their education, activities, and health. *See In re Marriage of Fortelka*, 425 N.W.2d 671, 673 (Iowa Ct. App. 1988) ("The parent having physical care will be the one receiving information on school events, getting conference slips and report cards. These should be shared with the other parent. Except for emergency situations, the parent then having physical care has a responsibility of communicating to the other parent the need to make the decision and making the necessary information available.").

In such a close case, we will not substitute our judgment for that of the district court. *See In re Marriage of Dunkel*, No. 12-0795, 2012 WL 5954579, at *2 (Iowa Ct. App. Nov. 29, 2012) ("In close cases, we give careful consideration to the district court's findings."); *see also In re Marriage of Woodward*, 228 N.W.2d 74, 75 (Iowa 1975) ("As difficult as it is to assess credibility of live testimony, it is more difficult to assess credibility from a cold transcript.").

Accordingly, we affirm the district court's order modifying physical care of the parties' children.

### B.    Appellate Attorney Fees

Both parties request appellate attorney fees.  Appellate attorney fees are not a matter of right, but rather rest in this court's sole discretion.  *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).  In determining whether to award attorney fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."  *Id.* (citation omitted).  After considering these factors, we decline to award appellate attorney fees to either party.

### IV.    Conclusion

Based upon our de novo review of the record and the district court's detailed credibility determinations, we affirm the order modifying physical care. We decline to award either party appellate attorney fees.

**AFFIRMED.**