**IN THE COURT OF APPEALS OF IOWA**

No. 17-0245
Filed June 6, 2018

**IN RE THE MARRIAGE OF EUGENE JOSEPH CHERNY
AND RUTH ANN CHERNY**

**Upon the Petition of
EUGENE JOSEPH CHERNY,**
        Petitioner-Appellant,

**And Concerning
RUTH ANN CHERNY,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Polk County, David May, Judge.


        A husband appeals the transfer of stock, distribution of other assets and debts, and amount and duration of spousal support pursuant to the decree dissolving the couple's marriage.  The wife requests appellate attorney fees. **AFFIRMED AS MODIFIED.**


        Jennifer H. De Kock, Steven P. Wandro, and Stefanie J. Thomas of Wandro & Associates, P.C., Des Moines, for appellant.

        Anjela A. Shutts and Van T. Everett of Whitfield & Eddy, P.L.C., Des Moines, for appellee.


        Heard by Vogel, P.J., and Doyle and Bower, JJ.

**VOGEL, Presiding Judge.**

Eugene Cherny appeals provisions of the district court's decree of dissolution of his marriage to Ruth Ann Cherny. He asserts the district court erred in (1) requiring Ruth Ann to transfer her entire interest in the family's closely-held corporation to him in exchange for an equalization payment; (2) calculating and distributing the couple's other assets and debts; and (3) establishing the amount and duration of spousal support awarded to her. Ruth Ann requests appellate attorney fees. We find the district court properly and equitably ordered Ruth Ann to transfer her corporate shares to Gene in exchange for cash despite the pre-dissolution distribution of the shares, the corporate bylaws, the potential impact on non-parties, and the tax and distributive consequences of selling corporate assets. We also find the district court properly and equitably assigned assets and debts, including assigning the corporate debts to the corporations, but we make a small mathematical correction to the distribution. Additionally, we find the district court properly and equitably awarded spousal support to Ruth Ann despite the health of the parties and future retirement concerns. Finally, we decline to award appellate attorney fees to Ruth Ann. Accordingly, we affirm as modified.

## I.       Background Facts and Proceedings

Eugene (Gene) and Ruth Ann Cherny were married on July 25, 1987. At the time of dissolution, Gene was sixty years old, and Ruth Ann was fifty-eight years old. The parties have three children, who were twenty-seven, twenty-five, and twenty-two years old at the time of dissolution.

Gene completed his medical residency in 1989. The couple then moved to the Des Moines area so he could work as a surgeon specializing in plastic and

reconstructive surgery. At the time of dissolution, Gene remained a surgeon at his practice, Heartland Plastic Surgery (Heartland). He worked long hours throughout the week when he began his practice. As time went on, Gene developed multiple health issues, including arthritis, spinal and rib fusions, heart disease, and an aortic aneurysm. His health prevents him from working over eighty hours per week as he has worked in the recent past. Regarding his future in practicing medicine, he testified, "I feel that my skills and judgment are at the best they've ever been, so I hate to give it up because I love the work that I do. I love the way I help people, so I'm going to keep going for another couple of years, God willing." He has made no definite plans to retire.

Ruth Ann is a nurse who obtained certification as an emergency nurse in New Jersey in 1983 or 1984. She no longer holds a nursing license in any state. Once the couple moved to Iowa, she stayed home to take care of their children and their home. She was the primary caretaker of the children, doing "everything that goes along with children." In 2013, she began working as a retail sales associate and, at the time of dissolution, she worked for Chico's and Mainstream Boutique. At Chico's, she works twelve to twenty-eight hours per week and earns $10.42 per hour. At Mainstream Boutique, she works one Saturday per month and earns $25 per hour. She does not receive benefits from either employer.

The parties' most substantial asset is their combined interest in JSV Community Properties, Inc. (JSV). JSV is a real estate holding company, which Gene and Ruth Ann formed during the marriage to protect their income from malpractice claims and other economic dangers affecting medical professionals. Gene owns thirty-six percent of JSV shares, Ruth Ann owns thirty-four percent,

and each of their three children owns ten percent of the shares. Gene also owns a majority of the voting shares and is the primary decision-maker for JSV.

Gene testified the couple was "in a looming financial crisis" toward the end of the marriage as their expenses consistently exceeded their income. He testified Ruth Ann spent up to $30,000 per month on "clothes and food and stuff." After they exhausted their savings and maxed their credit cards, they began using credit lines from Heartland and JSV for personal expenses. In January 2016, the holder of the Heartland line of credit converted $375,000 of the credit line into a term loan. Heartland makes the payments on this term loan.

In approximately June 2013, shortly after the couple physically separated, Ruth Ann withdrew $100,000 from the JSV bank account. She testified she used this money for living expenses, including utilities, groceries, and insurance premiums. As part of an informal agreement between the parties, she also gave a total of $1500 per month in direct support to two of their adult children. Beginning in January 2015, Gene paid $5000 to Ruth Ann in monthly support under a formal temporary agreement. She acknowledged she spent "quite a bit"—"probably" over $20,000—on an investigation related to the separation and eventual divorce.

James Nalley, an expert witness for Gene, calculated recent all-source income for each party as follows:

| Year | Gene | Ruth Ann |
|------|------|----------|
| 2011 | $475,256 | $14,134 |
| 2012 | $324,588 | $2,601 |
| 2013 | $457,023 | $11,689 |
| 2014 | $271,795 | $16,917 |

Nalley calculated the annual net incomes of both parties without spousal support of $375,000 for Gene and $59,500 for Ruth Ann. Gene also submitted an affidavit

claiming his monthly expenses are $14,222.71. Brian Crotty, an expert witness for Ruth Ann, calculated the annual net incomes of both parties without spousal support of $511,916 for Gene and $15,000 for Ruth Ann. Ruth Ann also submitted an affidavit claiming her monthly expenses are $15,339.

On November 25, 2014, Ruth Ann filed a petition for dissolution. On June 28 and 29, 2016, the matter came on for trial. On August 25, the district court entered its decree for dissolution of marriage. The district court found the ownership of JSV was divisible. It reduced the value of the JSV shares by twenty percent for the capital gains tax due for liquidating JSV assets, and it ordered Ruth Ann to transfer her interest to Gene with an equalization payment in return. The court declined to distribute the Heartland debt and the JSV withdrawal, finding both parties made personal draws on the corporations and the record did not establish the balance of the draws. The court distributed the couple's property, awarding most of the property by value to Gene with an equalization payment of $3,267,000 paid to Ruth Ann. After considering the factors of spousal support and all evidence, including the testimony of all witnesses, the district court awarded Ruth Ann $8000 per month in spousal support. The district court declined to address whether spousal support should or should not continue after retirement due to the uncertainty of when retirement may occur; instead, it directed the parties to pursue modification if and when a substantial change occurs.

Both parties filed motions to amend the decree of dissolution. On November 23, the court addressed the parties' arguments and ordered the following amended distribution of property:

| Description | Gene | Ruth Ann |
|---|---|---|
| 2918 W. Logan #1E | $67,900 | |
| 500 S. 26th St. | | $500,000 |
| 308 Indianola Road | $38,250 | |
| Ford Ranger | $1000 | |
| Toyota Corolla | $500 | |
| Windstar | $1000 | |
| GMC Savana | $2000 | |
| Cadillac | | $8250 |
| Morgan Stanley | | $388,800 |
| Morgan IRA (Gene) | $53,500 | |
| Morgan IRA (Ruth Ann) | | $72,500 |
| John Hancock IRA | $1,354,000 | |
| West Bank | $1450 | |
| Bank Iowa | | $11,000 |
| Household Goods | Shared | Shared |
| Coin collection (reduced for sales and taxes) | | $1,400,000 |
| Heartland | Net nil | |
| 70% of JSV (reduced for liquidation costs) | $7,700,000 | |
| Promissory note | $34,000 | |
| West Bank Vivone LLC | $5000 | |
| **Sum** | **$9,335,600 [sic[1]]** | **$2,380,550** |

In the November order, the court increased the equalization amount to $3,300,000,[2] and it allowed Gene to pay the equalization under a seven-year payout schedule with interest and increasing minimum payments. Ruth Ann then filed an additional motion to amend or enlarge. On January 13, 2017, the district court entered its final order amending the decree. In this January order, the court further increased the total equalization payment to $3,477,525, and it adjusted the minimum payments and interest under the seven-year payout schedule.

---

[1] The district court apparently made an error in totaling the property awarded to Gene. Under the district court's valuations, Gene received $9,258,600 in property. See Part IV, infra.

[2] The change in the equalization amount in the November order resulted from changes to the property distribution and an adjustment for liquidity.

Gene appeals from the decree. Gene argues the district court erred by (1) ordering Ruth Ann to transfer her shares of JSV to him for an equalization payment, (2) calculating and distributing the parties' assets and debts, and (3) establishing the amount and duration of spousal support. Ruth Ann requests appellate attorney fees.

## II.     Standard of Review

We review dissolution cases de novo, giving "weight to the trial court's factual findings, especially with respect to the credibility of the witnesses." *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003). While we review questions of spousal support de novo, "we accord the trial court considerable latitude. We will disturb the trial court's order only when there has been a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 407 (Iowa 2015) (quotations omitted).

## III.     Transfer of JSV Shares

Gene argues the district court improperly ordered Ruth Ann to transfer her shares of JSV to Gene in exchange for an equalization payment. He claims the district court failed to consider, or improperly considered, several factors.

First, Gene asserts the court cannot, or at least should not, distribute the shares because the shares were already equitably distributed. According to him, both parties already owned near-equal interests in JSV, making it improper for the court to order a transfer of one party's near-equal interest for cash.

"Upon every judgment of annulment, dissolution, or separate maintenance, the court shall divide the property of the parties . . . ." Iowa Code § 598.21(1) (2014). "The court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties after considering"

several enumerated factors. *Id.* § 598.21(5). Under this language, the court has authority to divide "all property" in a dissolution, which includes the parties' shares of JSV. *See id.* Iowa courts have previously ordered similar transfers of stock in closely-held corporations in exchange for cash. *See, e.g., In re Marriage of Wiedemann*, 402 N.W.2d 744 748–49 (Iowa 1987); *In re Marriage of Alexander*, 478 N.W.2d 420, 422 (Iowa Ct. App. 1991). Gene notes the facts in the cited cases differ because the parties did not explicitly object to being forced to transfer the stock. Regardless, the Iowa Code gives courts the authority to divide "all property," which includes the JSV stock. *See* Iowa Code § 598.21(5)

To the extent Gene asserts the transfer is unnecessary because both parties already owned near-equal interests in JSV, he compares the JSV stock to assets such as gold bullion or stock in a publicly-traded corporation. He claims a court would likely not order one party to transfer such assets to the other party just so the other party could liquidate the asset for cash to make an equalization payment. However, the transfer of assets is not limited to only those transfers that are necessary; instead, the court must "equitably" transfer assets. *See id.* Furthermore, his assertion overlooks the unique aspects of JSV as a closely-held corporation, especially the fact that Gene owned a majority of the voting shares. Leaving the parties with their pre-dissolution interests in JSV would force Ruth Ann to remain a business partner with Gene while he retains the sole legal authority to make decisions for the business. Under these facts, ordering one party to take the entire marital interest in the business in exchange for cash was equitable. *See id.*

Second, Gene asserts the district court failed to properly consider the bylaws of JSV. The bylaws, which were adopted some twenty years before the

dissolution trial, include specific provisions controlling the transfer of shares. According to Gene, the bylaws control any transfer of JSV shares, and the court cannot, or at least should not, order a transfer that violates the bylaws. However, the court has broad power to equitably "divide all property" in a dissolution. *See id.* Gene provides no authority to explain why the corporate bylaws preclude the courts from exercising their statutory authority to divide corporate stock with other marital property. Therefore, we are not required to follow the bylaws when dividing the parties' property.

Gene also notes one factor the court is required to consider when dividing property is "Any written agreement made by the parties concerning property distribution." *Id.* § 598.21(k). Such agreements are typically entered into in anticipation of divorce. *See, e.g., In re Marriage of Butterfield*, 500 N.W.2d 95, 98 (Iowa Ct. App. 1993) ("A stipulation of settlement in a dissolution proceeding is a contract between the parties. The stipulation becomes final when it is accepted and approved by the court."). The bylaws do not mention divorce or any type of property distribution between the parties specifically, and thus they are not a "written agreement made by the parties concerning property distribution." *See id.* § 598.21(5)(k). The court may still consider the bylaws as an "[o]ther factor" determined to be relevant. *See id.* § 598.21(5)(m). However, Gene does not explain why the transfer procedure in the bylaws would result in a more equitable distribution than the procedure in the dissolution decree. While Gene's brief describes the bylaws as providing a "methodical and thoughtful approach to transferring shares" that "would allow for each asset of JSV to be property appraised," he does not appeal the court's valuation of any JSV asset or JSV as a

whole. Conversely, the dissolution decree allows Gene and his children to immediately own JSV in its entirety, with Gene retaining the voting shares, and it allows Ruth Ann to receive cash for her shares based on values no one disputes. Therefore, even if we consider the bylaws, we find the decree properly and equitably orders Ruth Ann to transfer her shares to Gene in exchange for cash.

Third, Gene asserts their children and JSV are indispensable parties, and the court cannot, or at least should not, enter the dissolution decree without joining them to the case.[3] A party is indispensable if its "interest is not severable, and the party's absence will prevent the court from rendering any judgment between the parties before it; or if notwithstanding the party's absence the party's interest would necessarily be inequitably affected by a judgment rendered between those before the court." Iowa R. Civ. P. 1.234(2). "If an indispensable party is not before the court, it shall order the party brought in." Iowa R. Civ. P. 1.234(3). The dissolution decree language at issue only requires Ruth Ann to transfer her shares of JSV in exchange for cash. While Gene may need to sell JSV assets for cash to make the equalization payment, the dissolution decree has no legal impact on JSV, its assets, or its other shareholders. *Contra Sandstrom v. Sandstrom*, 617 So. 2d 327 (Fla. Dist. Ct. App. 1993) (finding the trial court improperly ordered the sale of realty to fund alimony payments because the realty was owned by a corporation, which was owned by one of the parties with third-parties, and the corporation and third-parties had not been joined to the case). Furthermore, Gene has not

---

[3] Gene first argued the children and JSV are indispensable parties in his motion to amend, enlarge and reconsider, filed after the court's initial decree ordering distribution of the JSV shares. In the November 23, 2016 order, the district court rejected his argument.

identified any inequities that would require joinder of the children or JSV. While JSV and the children will be affected if JSV assets are sold, the district court found Gene "has represented any interest the children or JSV might have in this matter." We agree with the district court that JSV and the children are not indispensable parties, and the decree properly and equitably ordered the transfer of shares without joining JSV or the children to the proceedings.

Fourth, Gene asserts the district court failed to fully consider the tax consequences of liquidating JSV assets and the pro rata distribution to all shareholders resulting from any liquidation. According to Gene, these factors will require an excessive liquidation of JSV assets, far more than he needs to make the equalization payment, in order to pay taxes and the pro rata distribution to all shareholders. However, the district court explicitly considered the tax consequences in the dissolution decree when it "reduced the value of JSV shares by the twenty percent capital gains tax rate that would be realized upon liquidation." As stated above, the district court also considered the decree's potential impact on the children, and it explicitly found Gene represented their interests. Again, the decree does not order the sale of JSV assets. While Gene may sell some assets to fund the equalization payment over the allotted seven-year payment schedule, he has other assets and income sources. He has demonstrated financial sophistication and a strong desire to protect JSV assets throughout this proceeding. This indicates Gene will only sell as many JSV assets as needed, and the children will be entitled to their pro rata share of any such sale. Therefore, the district court already considered the fact that Gene will only receive a fraction of JSV assets sold, and we agree this fact does not render the decree inequitable.

To summarize, we agree with the district court that ordering Ruth Ann to transfer her shares of JSV to Gene in exchange for an equalization payment is proper and equitable, even considering the pre-dissolution distribution of the shares, the JSV bylaws regarding transfers, the decree's potential impact on non-parties JSV and its other shareholders, and the fact that Gene will only receive a fraction of JSV assets sold.

## IV.     Calculation and Distribution of Assets and Debts

Gene also argues the district court failed to distribute two items, and this failure combined with the transfer of JSV shares resulted in an inequitable property settlement.

Gene asserts the court should have assessed the $100,000 JSV withdrawal to Ruth Ann as an asset, and the court should have assessed the $375,000 Heartland debt to him as a debt. Ruth Ann testified she withdrew $100,000 from the JSV account in 2013 around the time of their physical separation, and she used the money for living expenses. Gene acknowledged both parties had used both credit lines for personal expenses. After reviewing the record, we, like the district court, cannot determine how much of the corporate liabilities are attributable to Gene personally, Ruth Ann personally, and each corporation. Accordingly, we agree with the district court that the record "does not clearly establish the 'balance' of such draws," and that "such losses should stay with the corporations."

Gene specifically asserts the JSV withdrawal should be considered a dissipation by Ruth Ann.

> A court may generally consider a spouse's dissipation or waste of marital assets prior to dissolution when making a property distribution. The dissipation doctrine applies when a spouse's

conduct during the period of separation results in the loss or disposal of property otherwise subject to division at the time of divorce. If improper loss occurs, the asset is included in the marital estate and awarded to the spouse who wasted the asset. However, the doctrine does not apply if the spending spouse used the monies for legitimate household and business expenses.

*In re Marriage of Kimbro*, 826 N.W.2d 696, 700–01 (Iowa 2013) (internal citations and quotations omitted). In *Kimbro*, our supreme court found no dissipation when one spouse spent $168,535 between separation and dissolution on "legitimate household and business expenses":

> Although we recognize $168,535 is a significant sum to spend, we find such expenditures over a year and a half do not amount to dissipation under these circumstances, where the spending spouse has essentially no salary, remains responsible for marital obligations, purchases a new home and makes renovations to ensure the home is comfortable for the children, supports three children financially— one in college and the other two in private school with costly extracurriculars—and finally, maintains the lifestyle of a marriage with dissolution assets of almost one million dollars.

*Id.* at 703. Ruth Ann compares favorably to the spending spouse in *Kimbro*. Ruth Ann spent a significant amount of money—$100,000—over a period exceeding one year before Gene began paying support under the temporary order. During this time, she had little salary, she remained responsible for the home, she paid direct support to two of her adult children under an agreement with Gene, and she maintained the lifestyle of a marriage with dissolution assets surpassing ten million dollars. *See id.* Under these facts, Ruth Ann used the JSV withdrawal for "legitimate household and business expenses" and did not dissipate the JSV withdrawal.

Regarding the Heartland debt, Gene asserts that, even if the balance of draws cannot be established, the district court failed to assign the debt to one of

the parties or the corporation. However, the district court explicitly found the corporate debts "should stay with the corporations." It considered Heartland's assets and debts in assigning a "net nil" value to the corporation. Therefore, the district court did not fail to assign the Heartland debt; rather, it assigned the debt to Heartland in reaching a "net nil" value for the corporation.

Finally, Gene asserts the district court inequitably distributed the property for all the reasons previously discussed. As explained above, we agree with the district court on the issues of the JSV shares, the JSV withdrawal, and the Heartland debt, and we do not adjust the property award due to these issues. Gene also notes the district court erroneously calculated the property distribution and equalization payment, as shown below:

|  | District Court's Calculations | Correct Calculations |
| --- | --- | --- |
| Gene's pre-equalization sum | $9,335,600 | $9,258,600 |
| Ruth Ann's pre-equalization sum | $2,380,550 | $2,380,550 |
| Difference between the parties' sums | $6,955,050 | $6,878,050 |
| Payment needed to equalize the parties | $3,477,525 | $3,439,025 |

We agree with Gene that the district court erroneously calculated the equalization payment, and we find a total equalization payment of $3,439,025 results in an equitable property distribution. The amount due for Gene's first equalization payment is reduced from $110,000 to $71,500. Interest on $3,439,025 runs from January 13, 2017.

### V.     Spousal Support

Next, Gene argues the district court inequitably awarded spousal support, in amount and duration, to Ruth Ann.  While we review questions related to spousal support de novo, "we accord the trial court considerable latitude.  We will disturb the trial court's order only when there has been a failure to do equity."  *Gust*, 858 N.W.2d at 407.  Under the Iowa Code,

> the court may grant an order requiring support payments to either party for a limited or indefinite length of time after considering all of the following:
>
> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> i. The provisions of an antenuptial agreement.
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1).  Courts are required "to equitably award spousal support by considering each of the above criteria."  *In re Marriage of Mauer*, 874 N.W.2d 103, 107 (Iowa 2016).

The district court found:

> factors (a), (b), (d), (e) and (h) all point toward an award of substantial support. This is a traditional marriage. The parties appear to have agreed that, while Dr. Cherny would work a great deal, Ruth Ann would take primary responsibility for household duties, including those related to the minor children. Moreover, given her long absence from the workforce, there is no substantial likelihood that she will be able to support herself in a manner close to that which she previously enjoyed.

The district court also considered evidence of both parties' future incomes and expenses, including the property distribution under Iowa Code section 598.21A(1)(c) and the accuracy of both parties' experts. It concluded a monthly spousal support payment of $8000 is appropriate.

Gene asserts the court did not consider the health of the parties, but the court explicitly considered Iowa Code section 598.21(A)(1)(b) ("age and physical and emotional health of the parties"). He has continued to earn a substantial income in recent years while living with his multiple chronic health issues. Gene also asserts the court did not consider the property distribution Ruth Ann received, but the court explicitly considered Iowa Code section 598.21(A)(1)(c) ("distribution of property") and the investment income she can derive from her distribution. He notes she received significantly more assets that are liquid or easily-liquefied, which she can invest to receive regular investment income. However, he received a similar net amount of property in the distribution, which he may also use for investment income. If he needs to liquidate assets to generate regular investment income, the district court has already discounted the value of his JSV shares for liquidation. Also, the largest asset she received in the distribution is the equalization payment. He may make payments toward equalization over seven

years that increase over time, and this delayed equalization payment limits her potential investment income in the near future. After considering all of the factors and the parties' arguments on appeal, we agree with the district court that a monthly spousal support award of $8000 is equitable.

Gene also asserts the district court should have addressed the eventual retirement of the parties in the spousal support award. He notes both parties are near enough to retirement age that the court could have ordered a contingency for retirement. However, "future retirement will ordinarily be considered to raise too many speculative issues to be considered in the initial spousal support award." *Gust*, 858 N.W.2d at 416. "[U]nless all of the factors in Iowa Code section 598.21C(1) can be presently assessed, future retirement is a question that can be raised only in a modification action subsequent to the initial spousal support order." *Id.* at 418.

Iowa Code section 598.21C(1) contains the factors to consider in determining whether a substantial change in circumstances has occurred that allows the modification of a spousal support order. The factors include changes in a party's employment, earning capacity, income, resources, or health. Iowa Code § 598.21C(1)(a), (e). While both parties are near retirement age, Gene testified he loves his work and he wants "to keep going for another couple of years, God willing." Gene could abruptly retire from practicing medicine, or he could slowly reduce his workload over the years as his health allows. Both parties could maintain their current health for years or experience a sudden and unpredictable change. Both parties have significant assets, which could generate considerable but unpredictable investment income after retirement. Gene's investment income

is especially unpredictable since it may depend on the strength of JSV after he makes the full equalization payment. Because of this uncertainty, Gene could soon retire with limited income, either voluntarily or involuntarily due to his heath, or his health could allow him to continue earning an income that justifies the support order for years to come. Furthermore, he has not provided any details as to what his eventual "retirement" would likely entail, which suggests the parties would continue to disagree whether he has "retired" for purposes of any contingency. Thus, we cannot craft retirement contingencies at this time that would be fair to both parties in all situations. Gene notes Iowa recently provided spousal support retirement contingencies for a couple near retirement. *See Mauer*, 874 N.W.2d at 111–12. However, the *Mauer* decision does not discuss the serious health issues and uncertain post-retirement incomes that are present here.[4] *See id.* Therefore, all factors of Iowa Code section 589.21C(1) cannot be presently assessed. *See Gust*, 858 N.W.2d at 418. We agree with the district court in declining to establish retirement contingencies for spousal support, and we leave open the possibility of a modification if a substantial change in circumstances occurs.[5] *Id.*

---

[4] We also note the *Mauer* decision agreed with the district court that retirement contingencies could be established in the decree, and our supreme court modified the amounts. *See Mauer*, 874 N.W.2d at 111–12. Here, the district court found retirement contingencies could not be established in the decree, and we find the district court's decision does not fail to do equity. *See Gust*, 858 N.W.2d at 418.

[5] Gene expresses concern that he may not be able to show a substantial change in circumstances because his health and retirement "were within the contemplation of the district court at the time it made its decision." *See In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014). While we cannot identify precisely when a substantial change in circumstances would occur, we find the uncertainty discussed above may allow Gene to show a substantial change in circumstances that justifies a change in the support order. *See generally id.* (finding a substantial change in circumstances where one party discovers a serious cancer after the decree).

**VI.    Appellate Attorney Fees**

Finally, Ruth Ann requests appellate attorney fees.  Appellate attorney fees are within the discretion of the appellate court.  *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996).  "In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal."  *In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App 2016) (quoting *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997)).  The parties accumulated a significant amount of property during their marriage, which resulted in complicated litigation and large property distributions to both parties.  Ruth Ann received a considerable amount of cash in the dissolution, including spousal support and the equalization payment.  By contrast, Gene received relatively few liquid or easily-liquefied assets in the property distribution.  Accordingly, she has sufficient cash for this appeal, and we decline to award her appellate attorney fees.

**VII.    Conclusion**

We find the district court properly and equitably ordered Ruth Ann to transfer her JSV shares to Gene in exchange for cash despite the pre-dissolution ownership of the shares, the JSV bylaws, the potential impact on non-parties, and the tax and distributive consequences of selling corporate assets.  We also find the district court property and equitably assigned assets and debts, including assigning the corporate debts to the corporations, but we make a small mathematical correction.  Additionally, we find the district court properly and

equitably awarded spousal support to Ruth Ann in light of the unknown retirement contingencies. Finally, we decline to award appellate attorney fees to Ruth Ann.

**AFFIRMED AS MODIFIED.**