**IN THE COURT OF APPEALS OF IOWA**
No. 21-0403
Filed July 20, 2022

**IN RE THE MARRIAGE OF KATIE FROILAND
AND JUSTIN FROILAND**

**Upon the Petition of
KATIE JEANNE FROILAND, n/k/a KATIE JEANNE GAISER,**
        Petitioner-Appellee,

**And Concerning
JUSTIN ROBERT FROILAND,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Hancock County, Gregg R. Rosenbladt, Judge.

        A former husband appeals the physical care and economic aspects of a dissolution decree. **AFFIRMED**.

        William T. Morrison, Mason City, for appellant.

        Megan R. Rosenberg of Cady & Rosenberg Law Firm, P.L.C., Hampton, for appellee.

        Considered by Tabor, P.J., Badding, J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**TABOR, Presiding Judge.**

Katie and Justin Froiland divorced after a twelve-year marriage. In the decree, the district court granted them joint legal custody of their son, J.R.F. And Katie received physical care. On the financial side, the district court awarded Katie $16,000 for her premarital contribution to their home and accepted her approximation of the couple's equity in the property. The court also ordered Justin to return certain personal property to Katie and to pay her $2000 for a bracelet and rings if he could not locate them. Justin appeals the court's orders on physical care, the marital home, and the personal property. Deferring to the district court's determination that Katie was the more credible party, we affirm the decree.

## I. Facts and Prior Proceedings

Katie and Justin married in 2009. Katie trained as a medical secretary and certified nursing assistant. Justin attended diesel mechanic school. During their marriage, Katie worked full-time and attended college classes. By contrast, Justin did not work. Instead, he received disability payments after suffering serious injuries in a motorcycle accident in 2008.

J.R.F. was born in 2010. In 2011, the family left Mason City for Garner. Still, Katie kept her Mason City home—the subject of the parties' prenuptial agreement. The couple also kept separate finances.

The parties offered vastly different depictions of their caregiving duties in J.R.F.'s early years, leaving the district court to decide the more credible account. The record showed that because of his availability, Justin looked after J.R.F. while Katie worked and took classes. In addition, both extended families helped with J.R.F. According to Katie, when J.R.F. entered grade school, she was his primary

caretaker. She organized his day-to-day routine: helping with homework, preparing meals, doing laundry, scheduling medical and dental appointments, and attending school events. By contrast, Justin focused more on J.R.F.'s recreational pursuits, such as dirt bikes, ballgames, and hobbies. And the record shows Justin also helped his son with homework and other needs.

Justin and Katie separated in 2019. First, she and J.R.F. moved across town. Then, they moved in with her mother. Last, they moved back to her premarital home in Mason City. Katie and J.R.F. live there at the time of trial.

Katie and Justin did not communicate well after separating. For instance, they clashed over the school that J.R.F. would attend. And they squabbled over her belongings.[1] Katie also alleged that Justin "stalk[ed]" her while she and J.R.F. still lived in Garner, driving by her residence.

Justin exhibited other immature behavior to J.R.F.'s detriment. For example, Justin cut off the power to their home when Katie and J.R.F. were inside because Katie had not paid him for the electric bill. Then, after Katie enrolled J.R.F. in a Mason City school, Justin still dropped the child off at his former Garner school, where he was not enrolled. In another incident, Justin screamed at Katie during J.R.F.'s dirt bike event. Most concerning, he blocked communication between Katie and J.R.F. during his visitation.

At trial, the court awarded Katie physical care, listing these reasons:

> "[i]n assessing the credibility of the parents, the [c]ourt finds that Katie Froiland's historical review of J.R.F.'s parenting is more credible and accurate."
> "Katie Froiland appears to be better at maintaining structure and routine for J.R.F."

---

[1] Justin claims Katie and her sister sold many belongings.

"[Katie's] parenting of JRF appears to be more 'comprehensive,' than the parenting provided by Justin. Justin appears to be more oriented toward JRF's activities, and less of the day-to-day routine involving school, homework, meals, laundry, medical, and dental appointment, schools appoints and other day-to-day activities."

"It appears from the testimony that Katie . . . has taken a more active role in JRF's day-to-day routine, especially in the last several years. The [c]ourt believes that the parent's role has evolved over time and that Katie . . . prior to the parties' separation was providing most of the parenting and care for JRF."

"The parties do not get along well or communicate well. This is an *understatement. Of the two parties, Katie . . . appears to be most interested in avoiding conflict and engaging in debate.* A parenting time schedule with certainty for the parties appears to be in the best interests of JRF." (Emphasis added).

"The school question was not a primary consideration for the [c]ourt. The [c]ourt finds that both schools, GHV and Newman, would be appropriate for JRF. JRF most recently has been enrolled in Newman school in the community where Katie . . . is residing. The [c]ourt believes it would in JRF's best interest to continue that arrangement."

"In general, Katie . . . seems to be more organized and structured as well as reliable and detail-oriented."

Next, the court ordered Justin to return Katie's personal belongings within thirty days. If he failed to locate either her bracelet or rings, the court ordered him to pay her $2000.

Last, the court directed Justin to pay a net property equalization amount of $36,812.50 within ninety days. To show its figures, the court explained: "The [c]ourt calculates that there is roughly $57,146 in equity in the martial home. However, Katie Froiland calculates the home equity at $41,625, which is less than the [c]ourt's estimation. Therefore, Katie Froiland should be awarded one-half of her calculation of that equity which amounts to $20,812.50." And, "Katie Froiland contributed $16,000 toward the purchase of the home in Garner. Katie Froiland should be reimbursed for that amount, as those were premarital funds."

Justin appeals.

**II.    Scope and Standard of Review**

We review the dissolution decree de novo.  *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014).  We give weight to the district court's fact findings, especially on credibility of witnesses, but they do not bind us.  *Id.*

**III.    Analysis**

**A. Physical Care**

Both parties requested physical care of J.R.F.  To determine who should be granted physical care, we focus on the child's best interest.  *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007).  This focus is informed by the factors from Iowa Code section 598.41(3) (2020).  *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (applying section 598.41(3) to physical care decisions).  In deciding who will be the best physical care custodian, we weigh all statutory factors, but today we discuss these four most relevant considerations:

1. Whether the parents can communicate with each other regarding the child's needs.  Iowa Code § 598.41(3)(c).
2. Whether each parent can support the other parent's relationship with the child.  Iowa Code § 598.41(3)(e).
3. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.  Iowa Code § 598.41(3)(b).
4. Whether both parents have actively cared for the child before and since the separation.  Iowa Code § 598.41(3)(d).

Now we begin our analysis.  At the outset, we commend both parents' strong commitment to J.R.F, nurturing different facets of his life.  But like the district court, we find Katie will be better able to cater to J.R.F.'s day-to-day needs.  We offer four reasons why.

First, Katie has communicated with more respect than Justin has shown. *See* Iowa Code § 598.41(3)(c). True, Justin points to examples of miscommunication on her part. For instance, he felt blinded-sided when she enrolled J.R.F. in a Mason City school. And like the district court, we find some of their communication unpleasant. Yet Katie has been the more respectful parent. To that end, she sent Justin many detailed messages about their son. Considering J.R.F.'s young age, harmony for his sake is crucial. And placing physical care with Katie offers the best chance of achieving a positive working relationship between these parents.

Second, in that same vein, Katie has been more supportive of Justin's ties to J.R.F. than Justin has been of her bond with their son. *See* Iowa Code § 598.41(3)(e); *Hansen*, 733 N.W.2d at 698. Unlike Justin, she avoids conflict. Yet Justin has disrespected her in front of J.R.F. many times. We also have concerns about Justin preventing communication between J.R.F. and Katie during his visits. By contrast, Katie cheers J.R.F.'s connection with his father, like their shared love of dirt bikes.

Third, Katie's home is the stronger venue for meeting J.R.F.'s psychological and emotional needs. *See* Iowa Code § 598.41(3)(b). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. In seeking physical care, Justin argues the small town of Garner offers a more conducive setting, especially because his extended family lives there. Plus, in his view, the Garner-Hayfield-Ventura ("GHV") school district offers small class sizes and college scholarships. We don't dispute those strengths.

Even so, Katie's home in Mason City provides similar benefits. Katie also has support from her extended family. And like the GHV district, the Newman Catholic school boasts individualized attention for students and college options. Yet more important than any geographic distinctions are the relative abilities of the parents to raise the child in good physical, mental, and emotional health. The balance tips toward Katie's skills. She has shown herself to be the more stable, reliable parent, prioritizing J.R.F.'s well-being over any disagreements with Justin.

Fourth and finally, while both parents cared for J.R.F. in his younger years, Katie has been the primary custodian since she and Justin separated. *See* Iowa Code § 598.41(3)(d); *Hansen*, 733 N.W.2d at 696–97. She has managed J.R.F.'s welfare in several moves since 2019. She also tailored her work schedule to fit his needs, finding a school where he has thrived. What is more, she choreographed his day-to-day life. Meanwhile, Justin and J.F.R. enjoy hobbies and weekends together. And she supports those too. Simply put, J.F.R. depends on Katie. So we affirm Katie's physical care award.

## B. Economic Aspects of the Decree

Justin also challenges three financial facets of the decree. We untangle each of those issues in turn.

First, Justin addresses the Garner property, complaining the district court did not expressly award the home to him. He also asserts that the court must order the parties to execute a quitclaim deed for the house. We read the decree as awarding the Garner house to Justin and as requiring the parties to execute a quitclaim deed. We thus find those complaints resolved.

Second, he objects to the district court awarding Katie *both* fifty percent of the home's equity ($20,812.50) and $16,000 to reimburse her portion of the down payment. He contends that property award was inequitable under Iowa Code section 598.21(5) because it was essentially "double dipping" into the home's value. We disagree with Justin's objection. Under the court's valuation of the parties' equity in the house as $57,146, Katie would have received $28,573. So the court's adoption of Katie's lower figure was not only within the realm of credible evidence, but benefited Justin.

On the question of the premarital asset, we find the court did equity in setting aside $16,000 to Katie. The district court did not need to automatically award that entire down payment to Katie as premarital property. *See In re Marriage of Hansen*, 886 N.W.2d 868, 872 (Iowa Ct. App. 2016). But some circumstances justify giving full credit. *Id.* Full credit was justified here because Justin received other significant assets, such as an insurance settlement and several vehicles.

Third, Justin contends the district court erred by ordering him to return personal property to Katie or to compensate her for items that he cannot find. He balks at paying Katie $2000 for the value of rings and a bracelet. "As tedious as the chore may be, the district court has the obligation to equitably divide 'all' of the marital property between the parties in a decree. *See* Iowa Code § 598.21(1), (5)." *In re Marriage of Sundby*, No. 20-1552, 2022 WL 946508, at *7 (Iowa Ct. App. Mar. 30, 2022). Here, the court completed that tedious chore fairly. The court properly credited Katie's testimony about the location and value of the jewelry at issue. And so, we affirm Katie's $2,000 award.

## C. Appellate Attorney Fees and Court Costs

Both Katie and Justin request $4000 in appellate attorney fees. In our discretion to grant such awards, we consider (1) the needs of the party asking for fees, (2) the other party's ability to pay fees, and (3) the relative merits of their appeal positions. *In re Marriage of Towne*, 966 N.W.2d 668, 680 (Iowa Ct. App. 2021). While Katie prevailed on appeal, when we weigh her financial needs against Justin's ability to pay, we decline to award her fees. Each party should cover their own cost of appellate representation. Costs are assessed to Justin.

**AFFIRMED.**